NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LAUNDRY, LINEN SUPPLY & DRY
CLEANING DRIVERS LOCAL NO.
928, Affiliated With International Broth-
erhood of Teamsters, Chauffeurs, Ware-
housemen and Helpers of America, and
Local No. 52, Laundry & Dry Cleaning
Workers International, AFL–CIO, Re-
spondents.

No. 15947.

United States Court of Appeals
Ninth Circuit.

Dec. 18, 1958.

Jerome D. Fenton, Gen. Counsel,
Thomas J. McDermott, Associate Gen.
Counsel, Marcel Mallet-Prevost, Asst.
Gen. Counsel, Frederick U. Reel, James
A. Flynn, Attys., N. L. R. B., Washing-
ton, D. C., for petitioner.

Stevenson & Hackler, Charles K. Hack-
ler, Herbert M. Ansell, Los Angeles, Cal.,
for respondents.

Before FEE, BARNES and JERT-
BERG, Circuit Judges.

BARNES, Circuit Judge.

This is a petition of the National Labor
Relations Board for the enforcement of
its order against the two respondent un-
ions, under § 10(e) of the National Labor
Relations Act, charging the unions with
unfair labor practices. The Board had
jurisdiction over the unions, and this
Court has jurisdiction of the petition
since the practices in question occurred

in Long Beach, California. 61 Stat. 147, 29 U.S.C.A. § 160(e) (1952).

The Board found that respondents, by picketing customers of Southern Service Company, Ltd. (hereinafter referred to as Southern), with the object of forcing the customers to cease doing business with Southern, induced and encouraged the employees of these customers, and the employees of suppliers to these customers, to engage in a strike or concerted refusal to work, in violation of § 8(b) (4) (A) of the Act. 61 Stat. 141, 29 U.S.C.A. § 158(b) (4) (A). These findings are based on facts which are for all practical purposes undisputed by either party.

Southern is a non-union laundry operating some 30 plants throughout California, including several in Long Beach. The unions have for many years tried unsuccessfully to organize Southern, and at the time of the picketing in question Southern was the only major non-union laundry remaining in Southern California. Southern's plants have not been picketed in recent years, but both unions admit that the company was still the main target of their organizational efforts. Both respondents at this time were members of a group called "Southern Service Organizing Committee," whose purpose is apparent from the name.

Failing in their attempts to organize Southern by appeals to the Southern employees, the unions tried a new approach. Many of Southern's customers were retail establishments like barber shops, beauty shops, hotels and restaurants. A union representative approached these establishments and asked them to cease doing business with Southern and to change to a union laundry and linen service. The unions warned the firms using Southern's service that if they continued to use Southern linens a picket line would be placed in front of their places of business.

Between August 13 and 18, 1956, while the state AFL-CIO convention was being held in Long Beach, the unions sent pickets to patrol outside various Long Beach restaurants. The sign carried by these pickets read:

"NOTICE TO THE PUBLIC
This Establishment's Linens are Being Processed By a Non-Union Laundry"

The words at the top were changed to read "Notice to Patrons" after this litigation was initiated. The picketing stopped after August 18, but was resumed at a single restaurant on October 8, 1956 and was continuing at the time of the hearing. Although the picketing was largely confined to mealtimes, it continued at one restaurant all day. Deliveries of suppliers to these places occur all during the day so that some deliveries were made while the picketing was going on, during meal hours. At some of the restaurants the unions only picketed the customer's entrances and did not picket the delivery entrances; however, at three of them where the entrances were used by both the customers and deliverymen the unions picketed these entrances without regard to this fact. The pickets were instructed not to tell restaurant employees and deliverymen that they were free to cross picket lines, but on the contrary were told not to answer any inquiries, but to hand the inquirer a card with the telephone number of the union's representative.

Because of the picket lines there were four or five instances where deliverymen, members of various other unions, refused either entirely or for several hours or several days to make deliveries to the restaurants because they were under the mistaken impression that to do so would require them to cross a picket line and might subject them to a $100 fine from their own unions for such action. The picket lines crossed the place where the deliveries would have to be made so that the deliverymen refused to make such deliveries. At Madsen's restaurant a Carnation Dairy driver refused to make a delivery, and it was later made by the Carnation Company in a private car. Several of Madsen's suppliers called the firm and told them that they could not deliver because of the picket lines, al-

though after checking with various unions on this point, deliveries later resumed. At one of the other restaurants, Grisinger's, similar events happened, and in fact the restaurant owner was forced to pick up the supplies himself because of this. Several suppliers called and told the Grisinger firm that they could not make deliveries because of the picket lines. At all three of the restaurants in question, the pickets definitely crossed the area where the deliveries would have to be made, albeit of necessity since this was also the customer entrance. The unions claim that the picketing was directed solely at *customers* of the restaurants and not the employees of the restaurants or their suppliers.

Apparently in all of the cases of refusal to deliver, the problem was ultimately straightened out by phone calls and conferences with various unions, and deliveries eventually were resumed. Also, aside from several cases where the restaurant employees questioned whether they could go to work, it likewise appears that none of the *restaurant employees* refused to work, or refused to cross the picket line.

Upon the foregoing facts the Board found that the unions' action of picketing entrances used by both customers and deliverymen, induced not only customers, but also employees of the restaurants and their suppliers, not to cross the picket line. The Board also found that such response constituted a concerted refusal to work within the meaning of § 8(b) (4) (A) of the Act. 61 Stat. 141, 29 U.S.C.A. § 158(b) (4) (A). As the admitted object of the picketing was proscribed by the Act—namely forcing the restaurants to stop doing business with Southern—the Board concluded that this action of the unions violated § 8(b) (4) (A).

Basically, the question here presented is whether the conduct of the unions constitutes activities proscribed by the cited section of the Act.

The problem narrows down to an examination of two things: (1) the subjective intent of the unions shown by the evidence, both circumstantial and direct (see N. L. R. B. v. International Union of Operating Engineers, 8 Cir., 1954, 216 F.2d 161, 164); (2) whether or not the unions' activities were accomplished with sufficient clarity of purpose that "neutrals" were not misled as to its purpose. See Retail Fruit & Veg. Clerks Union v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591, 598.

■ The NLRB's determinations of these questions must be based on substantial evidence. They are the findings of the Board as to questions of fact and hence conclusive in the absence of an abuse of discretion. 61 Stat. 148, 29 U.S.C.A. § 160(e). Thus, essentially this case reduces itself to a question of fact: whether the admitted facts are enough to put the unions' actions within the prohibited area of the Act. The Board argues that this is a secondary boycott aimed at unoffending employers (the restaurants) by seeking to disrupt their business unless they ceased doing business with the non-union Southern. The Board points out that the section of the Act in question was aimed at "shielding unoffending employers and others from pressures in controversies not their own." N. L. R. B. v. Denver Building & Const. Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284.

On the other hand, the argument of the unions is that their actions did not violate the letter of the law since they claim the appeals of the pickets were directed solely to the customers of the restaurants and not the employees or the employees of suppliers. The evidence belies this claim of the unions.

The Board theory is that the primary purpose of the unions was to organize Southern; failing in direct attempts they tried another method—that of forcing customers of Southern to change to a union laundry by driving their customers away by this picketing. This, alone, is legal if done in a legal manner. Whenever a restaurant or other customer of Southern gave up and changed to a union laundry service, the pickets

were withdrawn. But the unions placed the picket lines across the entrances used by customers and deliverymen alike, and the natural effect of this was to cause a disruption of supplies to the restaurant since the union deliverymen refused to cross the line. The appeal of such a picket line is to everyone seeing it, *unless the picketing is clearly limited to a certain purpose,* and all seeing it can immediately ascertain against whom it is directed. See, for example, N. L. R. B. v. General Drivers Union, 5 Cir., 1955, 225 F.2d 205, 210, cited by the unions as directly in point. In that case, the signs the pickets carried specifically referred onlookers to pamphlets which the strikers carried for information, and the pamphlets "expressly advised any interested party" who the picketing was against. We compare that with the situation in the instant case, where the pickets were instructed *not* to tell anyone anything, but to give them a card with a telephone number on it. No one used the telephone number. It may be that the unions here did make some little effort to see that the public was informed, but their effort was not convincing. The unions did nothing to dispel the natural effect of a picket line, as was done in the case relied upon above, but in fact seemingly tried to obscure the actual facts.

The unions argue that the Board in its conclusions completely ignores the unions' efforts to limit the effect of the picket lines; that the respondent unions informed other unions that this picketing was directed solely at customers of the restaurants; that it was merely "an advertising picket line." [1] This seems of questionable effect in light of the testimony of various union members and officials as to how this information was communicated, or more accurately, was *not* communicated to rank and file membership.[2] Furthermore, the unions assert that the placards carried by the pickets were "unequivocably directed solely to patrons of the restaurants."

But this is not true. It was only after litigation in this matter started, on December 5, 1956, that the cards were changed to read "Notice to Patrons." This was long after the damage was done.

The unions rely principally upon two cases, General Drivers, supra, is one of them. The other case, N. L. R. B. v. Business Machine Mechanics Union, 2 Cir., 1955, 228 F.2d 553, while somewhat similar in facts, is readily distinguished. The court there specifically pointed out that neither the Board nor the trial examiner found that the union's intent was to induce employees of neutral firms to strike or refuse to work. Id. at page 559. But here, we have a specific finding of the Board that this was the obvious intent of the unions.

The balance of the unions' brief is largely devoted to attacking the Board's use of circumstantial evidence to discover the intent of the unions and their picketing. The unions claim that if this case is enforced, it will mean that "*all* secondary picketing will have been effectively outlawed." We cannot agree. The cases are clear that secondary picketing may be done, *where the union makes clear to everyone just whom the picketing is directed at and why.* See, e. g., the General Drivers case, supra.

This instant case is similar to N. L. R. B. v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, 904–905, wherein it was pointed out that no employee of a secondary employer need actually strike for the picketing to be a violation of the Act, since it is the *inducement* to strike that counts. We also rely on Retail Fruit & Veg. Clerks Union v. N. L. R. B., supra; Truck Drivers Union etc., v. N. L. R. B., 1957, 101 U.S.App.D.C. 420, 249 F.2d 512, 514–515, by Judge Fahy, former NLRB General Counsel; Amalgamated Meat Cutters v. N. L. R. B., 1956, 99 U.S.App. D.C. 24, 237 F.2d 20, also by Judge Fahy; and Brewery and Beverage Drivers and

---

1. Tr. p. 93.

2. Tr. 73, 78, 82, 86, 87–88, 92, 93 and 94.

Workers Local 67 v. N. L. R. B., 1955, 95 U.S.App.D.C. 117, 220 F.2d 380.

There is substantial evidence in the record of unfair labor practices under § 8(b) (4) (A). The petitioner is entitled to a decree enforcing its order.