228 F.2d 553
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BUSINESS MACHINE AND OFFICE APPLIANCE MECHANICS CONFERENCE
BOARD, LOCAL 459, INTERNATIONAL UNION OF
ELECTRICAL, RADIO & MACHINE WORKERS,
CIO, Respondent.
 No. 53, Docket 23523.
 United States Court of Appeals Second Circuit.
 Argued Oct. 7, 1955.
Decided Dec. 22, 1955.
 
 Norton J. Come, Attorney, National Labor Relations Board, Washington, D.C. (Theophil C. Kammholz, General Counsel, David P. Findling, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Melvin Pollack, Attorney, National Labor Relations Board, Washington, D.C., on the brief), for petitioner.
 Benjamin C. Sigal, Bert Diamond, Washington, D.C., Delson, Levin & Gordon, New York City (Ernest Fleischman, New York City, of counsel), for respondent.
 Before HAND, MEDINA and LUMBARD, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 This case arose out of a labor dispute between the Royal Typewriter Company and the Business Machine and Office Appliance Mechanics Conference Board, Local 459, IUE-CIO, the certified bargaining agent of Royal's typewriter mechanics and other service personnel. The National Labor Relations Board now seeks enforcement of an order directing the Union to cease and desist from certain picketing and to post appropriate notices.
 
 
 2
 The finding of the Board, adequately supported by the record, disclose the following facts, about which there is no significant dispute. On about March 23, 1954, the Union, being unable to reach agreement with Royal on the terms of a contract, called the Royal service personnel out on strike. The service employees customarily repair typewriters either at Royal's branch officers or at its customers' premises. Royal has several arrangements under which it is obligated to render service to its customers. First, Royal's warranty on each new machine obligates it to provide free inspection and repair for one year. Second, for a fixed periodic fee Royal contracts to service machines not under warranty. Finally, Royal is committed to repairing typewriters rented from it or loaned by it to replace machines undergoing repair. Of course, in addition Royal provides repair services on call by non-contract users.
 
 
 3
 During the strike Royal differentiated between calls from customers to whom it owed a repair obligation and others. Royal's office personnel were instructed to tell the latter to call some independent repair company listed in the telephone directory. Contract customers, however, were advised to select such an independent from the directory, to have the repair made, and to send a receipted invoice to Royal for reimbursement for reasonable repairs within their agreement with Royal. Consequently many of Royal's contract customers had repair services performed by various independent repair companies. In most instances the customer sent Royal the unpaid repair bill and Royal paid the independent company directly. Among the independent companies paid directly by Royal for repairs made for such customers were Typewriter Maintenance and Sales Company and Tytell Typewriter Company.
 
 
 4
 On and after April 13, 1954 the Union picketed some of Royal's larger customers whom it had reason to believe were having independent companies do repair work on royal contract machines. This picketing continued until restrained on June 15, 1954 by a temporary injunction issued by the District Court for the Southern District of New York, 122 F.Supp. 43. During this time the Union picketed some 37 customers of Royal at their principal offices in Manhattan and Brooklyn, usually in large office buildings. This picketing was in all cases peaceful and orderly. The Board found it unlawful with respect to six of Royal's customers: Electrolux Corporation, Royal Indemnity Insurance Co., Lily-Tulip Cup Corporation, Vick Chemical Co., New York Life Insurance Co., and American Can Co. With respect to these companies the Board found that the picketing took place before entrances 'commonly used by members of the public, by employees of the picketed firm, and by employees of any other tenants of the building, and also by deliverymen making light deliveries.' There was no evidence that the picketing took place at entrances used exclusively by employees. No violation was found with respect to the other customers because the Board found that there was no evidence that the picketing took place before entrances used or likely to be used by employees.
 
 
 5
 From April 13th until April 23rd, or shortly thereafter, the pickets carried sings reading (with minor variations and with the picketed customer's name inserted):
 
 
 6
 Royal Business Machines In N.Y. Life Ins. Co. are being repaired by Scab Labor Local 459, IUE-CIO
 
 
 7
 Sometime after April 23rd the words 'Notice to the Public Only' were added to the signs in large letters at the top. This was on advice of counsel after a conference with representatives of the Board who suggested that the picketing was unlawful. The picketing was carried on during ordinary business hours and during the time when at least some employees would be going to lunch. In at least one instance picketing began before the start of employees' working hours.
 
 
 8
 One of the picketed customers, Charles Pfizer, did agree to discontinue doing business with Royal and the Union withdrew its pickets. There is no evidence to indicate that this came about through any pressure on or from any of Pfizer's employees.
 
 
 9
 The Board found, and it is conceded, that an object of the picketing of Royal's customers was to induce the customers to cease doing business with Royal. The Union contended that it sought to do this only by embarrassing the firms picketed and bringing its grievance to the attention of the customers of those firms and the general public. The trial Examiner found that the picketing constituted inducement and encouragement of employees, that the Union's professed intent not to influence employees was no defense, and that the picketing was therefore unlawful. These findings the Board adopted.
 
 
 10
 During May 1954 the Union also picketed four independent typewriter repair companies who had been doing work covered by Royal's contracts pursuant to the arrangement described above. The Board found this picketing unlawful with respect to Typewriter Maintenance and Tytell. Typewriter Maintenance was picketed for about three days and Tytell for several hours on one day. In each instance the picketing, which was peaceful and orderly, took place before entrances used in common by employees, deliverymen and the general public. The signs read substantially as follows (with the appropriate repair company name inserted):
 
 
 11
 Notice To The Public Only Employees Of Royal Typewriter Co. On Strike
 
 
 12
 Tytell Typewriter Company Employees Are Being Used As Strikebreakers
 
 
 13
 Business Machine & Office Appliance Mechanics Union, Local 459, IUE-CIO
 
 
 14
 Both before and after this picketing, which took place in mid-May, Tytell and Typewriter Maintenance did work on Royal accounts and received payment directly from Royal. Royal's records show that Typewriter Maintenance's first voucher was passed for payment by Royal on April 20, 1954 and Tytell's first voucher was passed for payment on May 3, 1954. After these dates each independent serviced various of Royal's customers on numerous occasions and received payment directly from Royal.
 
 
 15
 With one exception there was no evidence that the picketing of either the customers or the repair companies resulted in a strike or refusal to work by any employee. Such evidence as there was indicated that no employee ceased work or refused to operate any Royal typewriter or other machine. The one exception was Gordon Speer, a repairman for Lewis Business Machines Service Company, who was sent on April 22nd to repair a Royal typewriter at the Royal indemnity Insurance Company. On approaching the Royal Insurance office he saw pickets carrying signs as described above, without the words 'Notice to the Public' as these were not added until a few days later. Not wishing to cross the picket line, he called his office, explained that because of the pickets he would not make the repair, and was instructed to return.
 
 
 16
 On the above facts the Trial Examiner and the Board found that both the customer picketing and the repair company picketing violated § 8(b)(4) of the National Labor Relations Act, 29 U.S.C.A. § 158(b)(4) which provides:
 
 
 17
 'It shall be an unfair labor practice for a labor organization or its agents--
 
 
 18
 '* * * to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment * * * to perform any services, where an object thereof is: (A) forcing or requiring * * * any employer * * * to cease doing business with any other person; * * *.'
 
 
 19
 With respect to each type of picketing the question before us is the same: Was there substantial evidence on the whole record to support the Board's finding that the Union's acts constituted an unfair labor practice under this section? Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.
 
 The Independent Repair Company Picketing
 
 20
 We are of the opinion that the Board's finding with respect to the repair company picketing cannot be sustained. The independent repair companies were so allied with Royal that the Union's picketing of their premises was not prohibited by § 8(b)(4)(A).
 
 
 21
 We approve the 'ally' doctrine which had its origin in a well reasoned opinion by Judge Rifkind in the Ebasco case, Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, D.C.S.D.N.Y.1948, 75 F.Supp. 672, 676. Ebasco, a corporation engaged in the business of providing engineering services, had a close business relationship with Project, a firm providing similar services. Ebasco subcontracted some of its work to Project and when it did so Ebasco supervised the work of Project's employees and paid Project for the time spent by Project's employees on Ebasco's work plus a factor for overhead and profit. When Ebasco's employees went on strike, Ebasco transferred a greater percentage of its work to Project, including some jobs that had already been started by Ebasco's employees. When Project refused to heed the Union's requests to stop doing Ebasco's work, the Union picketed Project and induced some of Project's employees to cease work. On these facts Judge Rifkind found that Project was not 'doing business' with Ebasco within the meaning of § 8(b)(4)(A) and that the Union had therefore not committed an unfair labor practice under that section. He reached this result by looking to the legislative his tory of the Taft-Hartley Act and to the history of the secondary boycotts which it sought to outlaw. He determined that Project was not a person "wholly unconcerned in the disagreement between an employer and his employees" such as § 8(b)(4)(A) was designed to protect. This result has been described as a proper interpretation of the Act by its principal sponsor, Senator Taft, 95 Cong.Rec. (1949) 8709, and President Eisenhower in his January 1954 recommendations to Congress for revision of the Act included a suggestion which would make this rule explicit.
 
 
 22
 Here there was evidence of only one instance where Royal contacted an independent (Manhattan Typewriter Service, not named in the complaint) to see whether it could handle some of Royal's calls. Apart from that incident there is no evidence that Royal made any arrangement with an independent directly. It is obvious, however, that what the independents did would inevitably tend to break the strike. As Judge Rifkind pointed out in the Ebasco case: 'The economic effect upon Ebasco's employees was precisely that which would flow from Ebasco's hiring strikebreakers to work on its own premises.' And at 95 Cong.Rec. (1949) page 8709 Senator Taft said:
 
 
 23
 'The spirit of the Act is not intended to protect a man who in the last case I mentioned is cooperating with a primary employer and taking his work and doing the work which he is unable to do because of the strike.'
 
 
 24
 President Eisenhower's recommendation referred to above was to make it explicit 'that concerted action against (1) an employer who is performing 'farmed-out' work for the account of another employer whose employees are on strike * * * will not be treated as a secondary boycott.' Text of President's Message to Congress on Taft-Hartley Amendments, January 11, 1954. At least one commentator has suggested that the enactment of this change would add nothing to existing law. Cushman, Secondary Boycotts and the Taft-Hartley Law, 6 Syracuse L.Rev. 109, 121 (1954). Moreover, there is evidence that the secondary strikes and boycotts sought to be outlawed by § 8(b)(4)(A) were only those which had been unlawful at common law. 93 Cong.Rec. (1947) 3950, 4323 (Senator Taft), 2 Legislative History of the Labor-Management Relations Act, 1947, pp. 1006, 1106. And although secondary boycotts were generally unlawful, it has been held that the common law does not proscribe union activity designed to prevent employers from doing the farmed-out work of a struck employer. Iron Molders Union No. 125 of Milwaukee, Wis. v. Allis-Chalmers Co., 7 Cir., 1908, 166 F. 45, 51, 20 L.R.A.,N.S., 315. Thus the picketing of the independent typewriter companies was not the kind of secondary activity which § 8(b)(4)(A) of the Taft-Hartley Act was designed to outlaw. Where an employer is attempting to avoid the economic impact of a strike by securing the services of others to do his work, the striking union obviously has a great interest, and we think a proper interest, in preventing those services from being rendered. This interest is more fundamental than the interest in bringing pressure on customers of the primary employer. Nor are those who render such services completely uninvolved in the primary strike. By doing the work of the primary employer they secure benefits themselves at the same time that they aid the primary employer. The ally employer may easily extricate himself from the dispute and insulate himself from picketing by refusing to do that work. A case may arise where the ally employer is unable to determine that the work he is doing is 'farmed-out.' We need not decide whether the picketing of such an employer would be lawful, for that is not the situation here. The existence of the strike, the receipt of checks from Royal, and the picketing itself certainly put the independents on notice that some of the work they were doing might be work farmed-out by Royal. Wherever they worked on new royal machines they were probably aware that such machines were covered by a Royal warranty. But in any event, before working on a Royal machine they could have inquired of the customer whether it was covered by a Royal contract and refused to work on it if it was. There is no indication that they made any effort to avoid doing Royal's work. The Union was justified in picketing them in order to induce them to make such an effort. We therefore hold that an employer is not within the protection of § 8(b)(4)(A) when he knowingly does work which would otherwise be done by the striking employees of the primary employer and where this work is paid for by the primary employer pursuant to an arrangement devised and originated by him to enable him to meet his contractual obligations. The result must be the same whether or not the primary employer makes any direct arrangement with the employers providing the services.
 
 The Customer Picketing
 
 25
 The picketing of Royal's customers was clearly secondary picketing with the object defined in § 8(b)(4)(A). The Union conceded that its aim was to force the customers to cease doing business with Royal and with the independent repair companies. But the Taft-Hartley Act does not proscribe all secondary activity. We have held that requests and threats addressed directly to secondary employers are not illegal, Rabouin v. N.L.R.B., 2 Cir., 1952, 195 F.2d 906, 911, 912; see N.L.R.B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900; and we have indicated that solicitation of customers of secondary employers is also lawful. See N.L.R.B. v. Service Trade, Chauffeurs, Salesmen, and Helpers, Local 145, supra, at 191 F.2d 65 at page 68. The only thing proscribed by § 8(b) (4) is inducement or encouragement of is of the employees of customers.
 
 
 26
 We turn then to the question of what constitutes such unlawful inducement and encouragement. We have recently decided that these words do not require a finding that the picketing was successful in convincing any employee to strike or cease performing services. N.L.R.B. v. Associated Musicians, supra. But in the Musicians case the Trial Examiner and the Board both found that one of the objects or purposes of the picketing was to induce the employees of secondary employers to engage in prohibited concerted activity, and there was substantial evidence to support that finding. There the evidence showed that there was picketing at entrances not used by the general public and that there was no indication from the signs carried by the pickets that employees were not being encouraged to strike. We based our reasoning there partially on legislative history indicating that attempts to induce or encourage were proscribed. In the case now before us, however, the Trial Examiner found that the Union's intent not to induce employees was irrelevant if there was in fact inducement of the employees. Hence he made no finding that it was an object of the Union to influence employees, nor did the Board make any additional finding in this respect. We therefore have a situation where the Board found neither an attempt to affect employees nor any actual effect upon them from which the attempt could be inferred. The Trial Examiner went no further than to find that the 'natural and probable consequence of' the picketing was to induce or encourage the employees to engage in concerted activity. We must therefore consider whether such a finding is a sufficient one upon which to predicate the conclusion that § 8(b)(4)(A) has been violated and if so whether the finding here was based upon substantial evidence.
 
 
 27
 The words of the statute, 'to induce or encourage,' do not necessarily carry with them a requirement that intent to induce or encourage be shown. It may be true that something less than a finding of specific intent to induce or encourage employees will suffice to support the Board's conclusion that § 8(b)(4) (A) has been violated. If it were shown that such inducement was the inevitable result or even the 'natural and probable consequence' of the picketing this would perhaps be enough. Certainly if it were shown that the employees actually ceased work, no finding of intent would be necessary. But in this case there was insufficient evidence to support any of these findings. It was not shown that the picketing had any tendency to induce the employees to strike or cease performing services. The evidence showed, on the contrary, that no employee refused to work or to use a Royal machine.
 
 
 28
 Typical of the testimony is that of Frank DeGilio, office manager and purchasing agent of the Electrolux Corporation at its main office, 500 Fifth Avenue. He testified that he saw none of the pickets approach or talk to any of Electrolux's 650 employees in the building, that none of those employees went on strike, and that no typist refused to work on a Royal machine. Similar testimony was elicited from Victor Edwards, assistant purchasing agent for the Lily-Tulip Cup Corporation, and Vernon Siegler, an attorney in the office of the General Counsel of the New York Life Insurance Company. Mr. Siegler testified to picketing at the 51 Madison Avenue office building where 4,955 of the insurance company's employees worked. The Union Picketed 37 of Royal's customers on many different days over a period of three months and the General Counsel was apparently unable to produce evidence of any effect upon a single one of the many thousands of employees of these customers. With respect to 31 of the firms no violation was found because it was not even shown that the Union Picketed entrances 'used or likely to be used' by employees. The Speer incident is not relevant because he was an employee of one of the repair companies whom we have found the Union had a right to picket. Moreover, under the rule of N.L.R.B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, inducement of Speer would not be inducement of concerted activity.
 
 
 29
 It is true that picket lines are often effective to prevent union members from crossing them. But here there was no evidence that any of the employees of Royal's customers, working at the 37 picketed office buildings, were unionized either by Local 459 or by any other union. Indeed it is likely that most or all of them were not as it is common knowledge that office workers are relatively unorganized. See also Monthly Labor Review, Vo. 78, No. 1, page 64 (U.S. Department of Labor, Bureau of Labor Statistics, January 1955). It cannot be assumed that a picket line will prevent even unionized employees from crossing it when the union apparently intends that they shall cross and takes steps to make its intent plain. Such an assumption is even more doubtful when it appears, as it did here, that the employees unanimously disregarded the pickets and went to work. Cf. Douds v. Local 50, Bakery and Confectionery Workers International Union (Arnold Bakers), 2 Cir., 1955, 224 F.2d 49. Even the testimony of representatives of the picketed firms indicates that they had no fear that their employees would take any action to coerce them regarding their business with Royal. Their only fear seemed to be possible public embarrassment. Such embarrassment and persuasion the union is privileged to pursue. If on this evidence we were to grant the Board's petition with respect to the customer picketing, we would, as a practical matter, come very close to condemning all customer picketing. Clearly this is not the purpose of the Act.
 
 
 30
 Brewery & Beverage Drivers v. N.L.R.B., 1955, 95 U.S.App.D.C. 117, 220 F.2d 380, is not authority contrary to our holding here. The Board's findings and the Trial Examiner's intermediate report in that case show that there were distinguishing features, such as picketing of entrances used only for deliveries and actual stopping of deliveries. 107 N.L.R.B. 2991 (1953). Since we find in this case neither intent to induce, nor effective inducement, nor even probable inducement of employees, we conclude that there is no substantial evidence to support the Board's finding of unlawful inducement and encouragement of employees in violation of § 8(b)(4)(A).
 
 
 31
 Enforcement of the Board's order is therefore in all respects denied.
 
 
 32
 HAND, Circuit Judge (concurring).
 
 
 33
 The first controversy in this case is whether the Union did 'induce or encourage' employees of Royal's customers to strike against their own employers; if it did, its 'object' certainly was to compel the customers to 'cease doing business with' Royal. The Board did not find that one of the purposes of the picketing was to induce the customers' employees to strike, but it did find that such a strike would have been a 'natural and probable consequence of the picketing.' This, it also found, was enough to support a finding of the 'unfair labor practice' charged, because 'intent not to violate is of no avail when the natural and probable consequence of the act in question is to produce a prohibited result by an illegal means. Radio Officers Union of Commercial Telegraphers Union A.F.L. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455.' (It did not distinguish between 'intent' and 'motive.') In spite of much misgiving I am disposed to think that this was a misreading of the Supreme Court's decision on which the Board relied. As I understand it, the Court in that case did not say that the employer's motive was not crucial in deciding whether he had 'discouraged' joining the union; but it did say that a special finding as to his motive was not essential. So it seems to me that the upshot of the decision is that, if the evidence is strong enough, the court may conclude that, although the Board did not so find, no other finding was possible, and the case may be disposed of as though the finding had been made. I cannot otherwise account for the fact that motive was held to be critical, and yet that a finding of motive was unnecessary. Translated to the present occasion, it seems to me that we must dispose of this appeal by deciding whether the evidence was so imperative that the Board would have been obliged to find that the motive existed. That amounts to saying that we should assume that the motive did not exist unless we should have reversed any finding except that it did. That the Union may in fact have desired to cause the customers' employees to strike I can well believe; but, since the Board did not so find, the case against it lacks an essential element, unless the evidence is so persuasive that we should have reversed a finding that it was not one of the motives of the picketing to provoke the customers' employees to strike. Considering the extreme deference that we still owe to findings of the Board that concern labor relations,[1] I am not prepared to go so far as that. It would presuppose much more acquaintance than I have with what actuates those engaged in labor disputes to overrule a finding of the Board that it had not been one of the motives of the picketing to cause the customers' employees to strike.
 
 
 34
 There is stronger support for holding the picketing of the 'independents' an 'unfair labor practice.' Indeed, after making every allowance for the specialized experience of the Board, I am not prepared to say that I should have felt justified in affirming a finding that the picketing was not in part, indeed in chief part, actuated by a desire to induce their employees to strike. However, I do not think that we need decide that question because it seems to me that both 'independents' had so far associated themselves with Royal in the controversy with its employees as to forfeit their privilege as neutrals. After the picketing began both necessarily knew of the strike against Royal; indeed, the Union's representative spoke to each of them. I altogether agree that they were nevertheless entitled to do work for Royal's customers. On does not make oneself a party to the dispute with a primary employer by taking over the business that the strike has prevented him from doing. On the other hand if a secondary employer, knowing of the strike, not only accepts the customer of the primary employer but takes his pay, not from the customer but from the primary employer, I do not see any relevant difference in doing so from accepting a subcontract from the primary employer, which would certainly forfeit the exemption. As I understand § 8(b)(4)(A), it is meant to protect from industrial pressure employers, who have not made common cause with the primary employer. The theory is that they should be free to carry on their business without being subject to sanctions that are reasonable between parties to the dispute. When, however, a secondary employer accepts business for which the primary employer pays him, although it is not an inevitable inference that, but for the strike, the primary employer would have done the business himself, I see no reason why he should not be compelled to prove that the primary employer would not have done it, if he could have. Therefore I think that, even though the Union meant to induce a strike of the 'independents" employees, it was within its rights.
 
 
 35
 I am willing not to dispose of this proceeding finally, but to grant another hearing, but on this record I think the order should be reversed both as to the customers and as to the 'independents.'
 
 
 36
 MEDINA, Circuit Judge (concurring).
 
 
 37
 Perhaps I oversimplify the case. However that may be, it suffices in my view merely to say that the independents had allied themselves to such an extent with Royal that a picketing of their employees was lawful and proper. Thus far I agree with Judge Lumbard. As to the customers, however, the Board found that the natural and probable effect of the picketing was to induce and encourage the employees of Royal's customers to strike and that the real purpose of the union was not material. But the character of the picketing, the use for a period of several months of signs headed by 'Notice to the public only,' the fact that large office buildings were the places picketed, and the continued and uninterrupted crossing of the picket line by employees of Royal's customers, convince me that this record taken as a whole furnishes no basis, either for a finding that it was the purpose of the union to induce and encourage the employees of Royal's customers to strike, or a finding that the natural and probable effect of the picketing would be such inducement and encouragement. Accordingly there would be no point in our sending the case back to the Board for a finding on the basic issue of the purpose of the union.
 
 
 
 [1]
 Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; Radio Officers Union v. N.L.R.B., supra, 347 U.S. 17, 50, 57, 74 S.Ct. 323