Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

LOCAL 868, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, CHAUF-FEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, INDEPEND-ENT, Respondent.

Civ. No. 20292.

United States District Court
E. D. New York.

Jan. 11, 1960.

Ivan C. McLeod, Regional Director of the Second Region, National Labor Relations Board, New York City (James M. Fitzpatrick, Eugene Jackson, Washington, D. C., Donald R. Klenk, New York City, of counsel), for petitioner.

Miller & Bush, New York City (Irving T. Bush, New York City, of counsel), for respondent.

BARTELS, District Judge.

This proceeding is before the Court on a petition filed by the Regional Director of the Second Region of the National Labor Relations Board (herein called the Board), pursuant to Section 10(*l*) (29 U.S.C.A. § 160(*l*) of the National Labor Relations Act, as amended (herein called the Act), for injunctive relief pending the final disposition of the issues before the Board on a charge filed on October 30, 1959 by Metallurgical Processing Corp. (herein called Metallurgical), alleging that respondent has engaged in, and is engaging in, an unfair labor practice within the meaning of Section 8(b) (4) (A) and (B) of the Act as amended in 1947 [1] (said provision now being incorporated in Section 8(b) (4) (i), subparagraph (B), of the Act as amended in 1959). This section proscribes so-called secondary boycotts and other secondary pressure to require another employer to recognize or bargain with a labor organization.

Petitioner alleges, upon the evidence set forth in his petition, that he has reasonable cause to believe that the respondent has engaged in the unfair labor practice charged and that a complaint based thereon should issue. At the hearing testimony was heard from four witnesses who were employees of Metallurgical and two witnesses who were the business representatives of the respondent.

Metallurgical is in the business of heat treating and braising metal parts and assemblies for other companies and both it and its customers are engaged in commerce within the meaning of the Act. On October 7, 1959, respondent (which has not been certified as the representative of Metallurgical's employees) wired Metallurgical that it represented a majority of that company's employees and requested an appointment for the purpose of negotiating a collective bargaining agreement. On October 9, 1959, the president of Metallurgical had a meeting with company employees and, according to him, discussed the benefits Metallurgical had made available to its employees. Respondent claims that the president of Metallurgical at this meeting abused the respondent and made threats to withdraw the company benefits from workers who joined the Union. However, no competent evidence was adduced to support this claim which the respondent now alleges constitutes an unfair labor practice of Metallurgical and the real reason for the strike. On October 22, 1959, after respondent again made an unsuccessful demand for recognition, picketing commenced around Metallurgical's plant and has continued without interruption to the present time. At that time twelve of Metallurgical's seventeen employees went on strike and, with a few exceptions, have been replaced by Metallurgical.

---

1. The activities involved herein were conducted prior to the passage of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, and all references are to sections of the Act prior to the 1959 Amendment.

Metallurgical is in a service business and part of the service provided for its customers is pick-ups and deliveries of parts which are treated at the Metallurgical plant. These pick-ups and deliveries are made by means of four unmarked station wagons. Since the commencement of the strike three of Metallurgical's drivers were persons who performed other duties, one was an inspector at the plant, another a dispatcher, and the third was a salesman. On October 29th and 30th, these three employees drove the delivery wagons for Metallurgical and were followed by respondent's agents in a separate car as each made their pick-ups and deliveries at the plants of the various customers of Metallurgical. On those two days they were followed to more than sixteen of Metallurgical's customers and picketing took place at the establishments of at least sixteen of such customers. The picketing usually took the form of a single picket carrying a sign reading:

"On
Strike
Metallurgical
Processing
Corp.
Local 868
International Brotherhood
of Teamsters"

The picket patrolled in the immediate vicinity of the delivery wagon while it remained at the customer's plant during a pick-up or delivery. At six different customer establishments the picket was seen by employees of the customer and at two of such establishments was spoken to by an employee. At two customer establishments the picket spoke to an unknown truck driver and at two other establishments the picket spoke to two unidentified persons. At three of such establishments the area picketed was also the customers' employees entrance. At three places the driver of the station wagon was called a "scab" by the picket. On one of the trips the picket "tailgated" one of Metallurgical's drivers. At no establishment did the driver remain for less than five minutes or more than twenty minutes, during which time the picketing began immediately upon arrival and ended upon departure of the station wagon. During the strike the drivers were engaged in making pick-ups and deliveries between five and six hours a day, spending two to three hours a day at the plant. The delivery wagons departed from the plant and returned to the plant at least twice a day and the delivery wagon allocated to one of the routes was required to return to the plant at least five times a day.

The injunctive relief sought in the petition under Section 10(l) of the Act is interlocutory in nature pending the final determination of the unfair labor practice charged, now pending before the Board. The prerequisite of granting the relief is a finding by this Court that the Board has reasonable cause to believe that a violation of the Act has been committed and that the injunctive relief is "just and proper" under the circumstances. The Court is not called upon to decide whether, in fact, a violation of the Act has been committed, that determination being placed upon the Board subject to review by the Court of Appeals. N.L.R.B. v. Denver Bldg. & Const. Tr. C., 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284.

The question here presented is the application of the so-called "secondary boycott" provision contained in Section 8(b) (4) (A) and (B) of the Act.[2] By

2. Section 8
"(b) It shall be an unfair labor practice for a labor organization or its agents—
 *  *  *  *  *
"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer or-

this provision a Union is prohibited from inducing or encouraging the employees of any secondary employer to engage in a strike or a *concerted* refusal in the course of their employment to transport, process or otherwise handle or work upon goods or to perform any service where *an* object thereof is to force or to require such secondary employer to cease doing business with the primary employer or to force or require the primary employer to recognize or bargain with a Union which has not been certified.

■ "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." International Brotherhood of Electrical Workers v. N.L.R.B., 2 Cir., 1950, 181 F.2d 34, 37, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. Picketing at the premises of a secondary employer may, under certain conditions, be a form of pressure which is proscribed by the Act. N.L.R.B. v. Local 74, United Brotherhood of Carpenters, 1951, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309. On the other hand, picketing at a secondary employer's premises has been permitted when the secondary employer is harboring the *situs* of the dispute between the Union and the primary employer and the picketing complies with certain other requirements. Moore Dry Dock Co., 1950, 92 N.L.R.B. 547, 548–549; see, Hoosier Petroleum Co., 1953, 106 N.L.R.B. 629, 632–634, enforcement granted, N.L.R.B. v. Chauffeurs Local No. 135, 7 Cir., 1954, 212 F.2d 216.

The Moore Dry Dock doctrine has been held applicable by the Board only when there is, in effect, picketing of the primary employer at the place of business of the secondary employer when the primary employer has no permanent place of business where the Union can adequately publicize its labor dispute. The Board has held that the doctrine is not applicable when, as here, the primary employer has a permanent place of business where such dispute can be adequately publicized. Picketing at the premises of the secondary employer under these conditions, the Board claims must be aimed at the secondary employer and not at the primary employer and consequently is a violation of the Act. The Board asserts that this view has been endorsed by the courts and is applicable here, citing, among other cases, Washington Coca-Cola Bottling Works v. N.L.R.B., 1955, 95 U.S.App.D.C. 117, 220 F.2d 380; N.L.R.B. v. United Steelworkers of America, 1 Cir., 1957, 250 F.2d 184, 187; N.L.R.B. v. Truck Drivers & Helpers, 5 Cir., 1956, 228 F.2d 791, 796. The facts of these and other applicable cases, however, do not justify the conclusion of the Board that its view has been wholly endorsed or that it is applicable in this case. The strongest case in support of its contention is N.L.R.B. v. United Steelworkers of America, supra. There the factual situation was different. The picketing at the secondary employer's premises did not clearly disclose that the dispute was with the primary employer and the Union representative impliedly admitted that the objective of the picketing was the proscribed objective of pressure upon the secondary employers. In N.L.R.B. v. Truck Drivers & Helpers, supra, which is the next case most favorable to the Board's position, the signs did not limit the dispute to the primary employer and it was clear that the picketing was directed against the employees of the secondary employer. In Washington Coca-Cola Bottling Works v. N.L.R.B., supra, the picketing continued after the departure of the truck drivers and in some

ganization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employ-

er to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9".

instances took place at the common entrance used by employees of the secondary employer and caused some secondary employers to cease doing business with the primary employer. The automatic secondary boycott theory of the Board based upon picketing at the premises of the secondary employer enunciated in the Washington Coca-Cola Bottling Works case has not been accepted by the Court of Appeals of the District of Columbia, which enforced the order of the Board in that case. In fact, it has held that the rigid rule adopted by the Board was not supported by the language of the statute. Sales Drivers, etc. v. N.L.R.B., 1955, 97 U.S.App.D.C. 173, 229 F.2d 514. To the same effect is N.L.R.B. v. General Drivers, 5 Cir., 1955, 225 F.2d 205, 209, and LeBus v. Locals 406, etc., D.C. La., 1956, 145 F.Supp. 316, 320. Apparently the authorities in viewing picketing at the secondary employer's premises apply some of the criteria of the Moore Dry Dock case in determining whether such picketing is exempt from the condemnation of the Act. In order to constitute a violation of the Act they indicate that something more must be present than simply picketing at a secondary employer's premises, even though the primary employer has a permanent place of business, i. e., some additional factor or circumstance which converts such picketing into pressure upon the secondary employer. In this connection it is to be noted that ambulatory picketing *per se* is not prohibited by the Act. Bakery and Pastry Drivers, etc. v. Wohl, 1942, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; LeBus v. Locals 406, etc., supra. In enacting the provision of the Act now under consideration, it has been said that the dominant factor motivating Congress was to condemn the objective of the Union's secondary activities. International Brotherhood of Electrical Workers v. N.L.R.B., 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. Stated another way, it has been held that Congress had as one of its objectives the objective of

"shielding unoffending employers and others from pressures in controversies not their own." N.L.R.B. v. Denver Bldg. & Const. Tr. C., supra, 341 U.S. at page 692, 71 S.Ct. at page 953.

The essence of the problem here is whether the kind of picketing and related conduct employed in this case was in furtherance of a lawful or unlawful objective. If the objective was lawful, any adverse effect upon the secondary employers must necessarily be viewed as incidental to the lawful exercise of a statutory right. N.L.R.B. v. Chauffeurs, Teamsters, etc., 7 Cir., 1954, 212 F.2d 216, 219; see, N.L.R.B. v. International Rice Milling Co., 1951, 341 U.S. 665, 671, 71 S.Ct. 961, 95 L.Ed. 1277. There are some disturbing factors in this case which caused this Court some hesitancy in reaching its conclusion. Upon examination of the record as a whole, however, the Court finds that there was no effort here to induce or encourage a strike or a *concerted* refusal [3] on the part of the secondary employees to cease working upon the primary employer's goods and that the objective was not to require the secondary employer to cease doing business with the primary employer. The real purpose of the picketing was to advertise the dispute between the primary employer and the Union among the drivers of the station wagons. This is disclosed by the following facts: The employees picketed were away from the primary employer's premises five or six hours a day; the pickets were at the secondary employers' premises no more than twenty minutes and often only five minutes and never visited the same secondary employer more than once; the strike sign clearly indicated that the dispute was with the primary employer; no effort was made to threaten or contact the secondary employers or their employees; and there was no stoppage of work by the employees of secondary employers and no cessation of business

---

3. A different result might have been reached under the 1959 Amendment to the Act since concerted refusal is no longer required.

by any secondary employer with the primary employer.

From the foregoing, the Court is not persuaded that the Board has reasonable cause to believe that a violation of the Act has been committed. It may well be that after a full hearing before the Board sufficient evidence may be adduced to demonstrate that there has been a violation of Section 8(b) (4) (A) and (B) of the Act. That is not, however, the function of this Court. Petition denied. An order may be entered accordingly.