284 F.2d 887
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 294, INTERNATIONAL BORTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,
and its agents Edward Smith and Louis
Bonomo, Respondents.
 No. 26, Docket 26130.
 United States Court of Appeals Second Circuit.
 Argued Sept. 26, 1960.
Decided Nov. 10, 1960.
 
 Allison W. Brown, Jr., Washington, D.C. (Stuart Rothman, Gen. Counsel; Cominick L. Manoli, Associate Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel; Melvin J. Welles, Atty., N.L.R.B., Washington, D.C., on the brief), for petitioner.
 Harry Pozefsky, Gloversville, N.Y., for respondents.
 Before LUMBARD, Chief Judge, and TUTTLE* and FRIENDLY, Circuit judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 This petition presents questions as to the activities at premises of secondary employers in which a union striking against a trucking company could lawfully engage under 8(b)(4)(A) of the National Labor Relations Act, 29 U.S.C.A. 158(b) (4)(A), as this stood prior to its amendment by the Act of September 14, 1959, 73 Stat. 519, 542. We hold that, under the applicable standards of review, 29 U.S.C.A. 160(e); Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 477-491, 71 S.Ct. 456, 95 L.Ed. 456, the evidence sufficed to support the Board's finding of unlawful conduct.
 
 
 2
 K-C Refrigeration Transport Company, Inc., hereafter 'K-C,' provides refrigerated trucking and related services for the transportation of food products in and around Cohoes, New York. K-C's office and warehouse are at the New York Central's warehouse on one of the principal streets of Cohoes; K-C also rents a garage in the central business area of Cohoes for the storage and repair of its eight refrigerated trucks. K-C is owned and managed by a family group of some six persons; five of these, four Kowalchyk brothers and one Caldwell, work as truck drivers. In the fall of 1958 K-C had eight other employees. Three of these worked exclusively as drivers; one, Bielecki, doubled as driver and garage mechanic; three served as warehousemen; and one was office manager. Save for the office manager, all the employees and the officers were members of the respondent, Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 
 
 3
 K-C and Local 294 had been parties to an area-wide collective bargaining contract that ended on July 31, 1958. During the summer and fall, there were discussions between K-C and the union which are described in our opinion in a companion case, 284 F.2d 893. On December 10, 1958, Local 294 called a strike against K-C; the call was heeded only by the three non-owner drivers. The union picketed K-C's warehouse and garage. In addition, during the first few days of the strike, union pickets waited at some of the more important K-C pick-up or delivery stops and, when K-C trucks arrived, brought out signs stating 'K-C on strike with Local 294' and patrolled the loading or unloading area in the immediate vicinity of the trucks. Also, from the early days of the strike until March 7, 1959 when the District Court for the Northern District of New York issued a temporary injunction, McLeod v. Local 294, 190 F.Supp. 129, under 10(l) of the National Labor Relations Act, 29 U.S.C.A 160(l), union pickets followed K-C trucks along their routes in cars carrying placards with the legend above described; when the K-C truck would stop for a pick-up or delivery, pickets would park where the placard could be read by employees of the secondary employer and at times would also leave their cars to picket afoot in the vicinity of the truck. Other activities, which we will summarize below, took place at the premises of three secondary employers.
 
 
 4
 After hearing, the Board's Examiner found that Local 294 had violated 8(b)(4) (A) of the National Labor Relations Act, 29 U.S.C.A. 158(b)(4)(A). The Board overruled exceptions to the Examiner's report and entered an order requiring Local 294 to cease and desist from 'Engaging in, or inducing or encouraging the employees of Troy Warehouse Corporation, Wilson and Company, Tobin Packing Company, Central Warehouse Company, or the employees of any employer
 
 
 5
 other than K-C Refrigeration Transport Company, Inc. to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is to force or require any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of, or to cease doing business with, K-C Refrigeration Transport Company, Inc.' The Board seeks enforcement of this order. The case is to be determined under the provisions of the Taft-Hartley Act existing when the activities occurred, without regard to the extensive amendments made by the Act of September 14, 1959, 73 Stat. 519, 542, save, of course, as these may bear on the interpretation of the earlier statute.
 
 
 6
 Section 8(b)(4)(A) left a striking labor organization free to use persuasion, including picketing, not only on the primary employer and his employees but on numerous others. Among these were secondary employers who were customers or suppliers of the primary employer and persons dealing with them, Rabouin v. N.L.R.B., 2 Cir., 1952, 195 F.2d 906, 911; N.L.R.B. v. Business Machine and Office Appliance Mechanics Conference Board, 2 Cir., 1955, 228 F.2d 553, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483; N.L.R.B. v. International Union of United Brewery etc. Workers, 10 Cir., 1959, 272 F.2d 817; and even employees of secondary employers so long as the labor organization did not engage in or 'induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment' to handle goods of or for the primary employer with the objective of forcing the secondary employer to cease dealing with him. N.L.R.B. v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (picketing at primary employerhs situs); Seafarers' primary employer's situs); Seafarers' Atlantic and Gulf Dist., Harbor and Inland Waterways Division, A.F.L.-C.I.O. v. N.L.R.B., 1959, 105 U.S.App.D.C. 211, 265 F.2d 585 (at shipyard where primary employer's vessel was being overhauled); N.L.R.B. v. International Union of United Brewery Workers, supra (ambulatory and at customers' premises).
 
 
 7
 Drawing the line between the permitted and the forbidden activities has posed a problem for the Board and the courts fraught with more than the usual difficulties. Almost all picketing, even at the situs of the primary employer and surely at that of the secondary, hopes to attain the forbidden objective, whatever other motives there may be and however small the chances of success. See Chief Judge Prettyman's discussion in Seafarers' International Union v. N.L.R.B., supra, 265 F.2d at page 591, and Judge Wyzanski's in Alpert v. United Steelworkers, D.C.D.Mass.1956, 141 F.Supp. 447, 450-452. Yet the Supreme Court early made it plain that 8(b)(4)(A) did not render picketing unlawful simply because it had an effect on employees of a secondary employer, N.L.R.B. v. International Rice Milling Co., supra. When a secondary strike or concerted refusal to work has in fact occurred after activity at the situs of the secondary employer by the union engaged in the primary strike, it has been hard to resist the conclusion that the union induced or encouraged this, and we have said that in such a case no finding of intent is required, see N.L.R.B. v. Business Machine and Office Appliance Mechanics Conference Board, supra, 228 F.2d at page 560, a conclusion sound in common sense if not in strict logic. However, 'no employee of the secondary employer need actually engage in a strike in order that a violation of the Act be found,' N.L.R.B. v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, 905, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. In such cases the Board and the courts have had to make distinctions, often of a high degree of subtlety, with respect to picketing and other activities away from the primary employer's plant, and there has been a natural temptation to substitute mere evidentiary but readily ascertainable facts, such as the location and duration of the picketing, for the ultimate but more elusive element of intent. Whatever the validity of these distinctions as an interpretation of the statute, see Koretz, Federal Regulation of Secondary Strikes and Boycotts-- Another Chapter, 59 Col.L.Rev. 125, 129-44 (1959), the Taft-Hartley provision as applied did not satisfy the Congress as a matter of policy, see U.S.Code Congressional and Administrative News, 86th Cong. 1st Sess., 1959, pp. 2383, 2388, 2443, 2495, 2510, and Congress amended it in 1959 in a way which, hopefully, will reduce the interpretive problems.
 
 
 8
 Many of the controversies have centered over a statement of the Board in dismissing a complaint in Sailors' Union of the Pacific and Moore Dry Dock Co., 92 N.L.R.B. 547, 549 (1950). The Board there said as to the situation, 'When a secondary employer is harboring the situs of a dispute between a union and a primary employer':
 
 
 9
 '* * * In the kind of situation that exists in this case, we believe that picketing of the premises of a secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer.'
 
 
 10
 In N.L.R.B. v. Service Trade Chauffeurs, 2 Cir., 1951, 191 F.2d 65, 68, we endorsed this 'as a sound interpretation of the Act.' Certainly it was competent and useful for the Board to lay down, for the information of the General Counsel, its staff, unions and employers, that in this category of cases the Board would not draw an inference of the forbidden intent solely from evidence of picketing of the secondary employer that met all the stated criteria. However, not only has the negative of Moore Dry Dock become a positive, but later decisions such as Brewery & Beverage Drivers & Workers (Washington Coca Cola), 107 N.L.R.B. 299 (1953), and International Brotherhood of Teamsters etc. (Ready Mixed Concrete Co.), 116 N.L.R.B. 461, 473 (1956), were taken by the Examiner as establishing a 'fifth condition,' namely, that 'picketing at neutral premises (as of trucks of a primary employer while making deliveries to customers) will not be regarded as privileged primary picketing absent a showing that the primary employer has in the vicinity no permanent establishment that may be picketed effectively.' Although failure to meet this 'fifth condition,' alone or with other evidence, may warrant in inference of unlawful intent under some circumstances, as we found in N.L.R.B. v. International Brotherhood of Teamsters, 2 Cir., 1959, 272 F.2d 85, 88, the mere availability of a 'permanent establishment that may be picketed effectively' scarcely warrants a conclusion that picketing at the site of the secondary employer meeting the other criteria of innocence has the forbidden objective in all cases-- at least if 'Effectively' means effectiveness as regards the primary employees as the Examiner here thought.[1] On that basis, violation of the fifth criterion shows only that the secondary picketing had an objective other than persuading the primary employees,[2] not that the picketing necessarily had the particular objective which 8(b)(4)(A) forbids. N.L.R.B. v. General Drivers, Warehousemen and Helpers, 5 Cir., 225 F.2d 205, 209-210, certiorari denied, 1955, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801; Sales Drivers, Helpers & Building Construction Drivers, etc. v. N.L.R.B., 1955, 97 U.S.App.D.C. 173, 229 F.2d 514, certiorari denied, 1956, 351 U.S. 972, 76 S.Ct. 1025, 100 L.Ed. 1490; McLeod v. local 868, International Brotherhood of Teamsters, etc., D.C.E.D.N.Y. 1960, 179 F.Supp. 921.[3] Here picketing at the primary employer's premises could be 'effective' only as to the non-striking employes and the general public but not as to secondary employers, since only two of K-C's many customers[4] ever came to its warehouse, one once a week and the other once every two weeks, and apparently none ever came to the garage. Yet we have held that an endeavor to persuade secondary employers by picketing at their premises, which were not visited at all by the primary employees, is not necessarily unlawful, N.L.R.B. v. Business Machine and Office Appliance Mechanics Conference, supra, and we there distingusihed the enforcement of Washington Coca Cola in Brewery & Beverage Drivers & Workers Local Union No. 67 v. N.L.R.B., 1955, 95 U.S.App.D.C. 117, 220 F.2d 380, as resting on facts other than the availability of picketing at the primary site, as the Court of Appeals for the District of Columbia itself did in the Sales Drivers case, supra.
 
 
 11
 However, the record here showed activity at the secondary employers' premises in addition to the temporary picketing while K-C's trucks were there. This evidence we now summarize.
 
 
 12
 In the course of picketing the Albany packing plant of Wilson & Company, a customer of K-C, the union business agent spoke to the Wilson shop steward, a member of a different union, and asked for 'cooperation'; the agent testified he 'presumed' the shop steward 'would understand.' The steward did. He consulted the business agent of his own union who instructed him not to service K-C trucks that were being picketed; the steward then told other Wilson employees to notify him whenever a K-C truck appeared. He also talked to the Wilson Company manager; the record tells only that the manager said they would take no action 'until we see what happens'; nothing did. At the Central Warehouse Company in Albany, whose employees were represented by the respondent union, the shop steward made a gesture toward one of the Kowalchyks 'as though I was unclean'; thereafter the manager told Kowalchyk that 'he didn't think we would be able to make our pickups.' There was no picketing on this occasion but there was later when two somewhat similar incidents occurred. A Central Warehouse employee testified the Local 294 shop steward told him, 'We're having a little trouble with K-C; if you get any bills, hold up on the freight'; he said the foreman and office men were also notified that 'K-C is on strike, and not to give them any freight until they hear from the union.' Finally, at Troy Warehouse Corporation, whose employees were also represented by the respondent union but where there was no picketing, the business agent called the shop steward and requested cooperation; the shop steward told the employees not to service K-C trucks without first obtaining his clearance. At the agent's suggestion he also told his boss 'that Local 294 was having difficulty with K-C Transport, and that I wasn't sure whether they'd be picking anything up or delivering there because of that situation.'
 
 
 13
 The union argues that this conduct, like the picketing itself, is consistent with the inference that the union's purpose was simply to influence the secondary employer, both directly and by representations of his employees not involving a strike or concerted refusal to work, and that this inference is especially strong in the cases of Central and Troy, with which the union had agreements containing hot-cargo clauses. However, the inference that the secondary employees conveyed to their employer, and were intended by the union to convey, an indication that failure on his part to 'cooperate' would lead to a strike or concerted refusal to work is equally and perhaps more plausible. We have held that 'requests and threats addressed by respondents to employers, even though not illegal in themselves, Rabouin v. N.L.R.B.,supra, 195 F.2d at pages 911-912, may be considered in determining the motives for picketing.' N.L.R.B. v. Associated Musicians, supra, 226 F.2d at page 904. See also Truck Drivers and Helpers Local Union 728, etc. v. N.L.R.B., 1957, 101 U.S.App.D.C. 420, 249 F.2d 512, certiorari denied, 1958, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533, sustaining, after further consideration by the Board, the same order set aside in Sales Drivers etc. v. N.L.R.B., supra. The Examiner heard the witnesses and was better able than we to appraise the overtones, which may be highly significant in matters of this sort. If the Board was justified in finding that respondents sought to induce concerted employee pressure, the existence of hot-cargo clauses in the union's agreements with Central and Troy is immaterial. Local 1976, United Brotherhood of Carpenters and Joiners of America, A.F.L. v. N.L.R.B., 1958,357 U.S. 93, 106-107, 78 S.Ct. 1011, 2 L.Ed.2d 1186. We recognize there were some circumstances adverse to the unions in the Associated Musicians and Truck Drivers cases not present here, just as we think the evidence against the union in this case to have been stronger than that which the Tenth Circuit held inadequate in N.L.R.B. v. International Union of United Brewery Workers, supra. In reviewing decisions under 8(b)(4), we are not to forget either that 'The words 'induce or encourage' are broad enough to include in them every form of influence and persuastion.' International Brotherhood of Electrical Workers, Local 501, A.F. of L. v. N.L.R.B., 1951, 341 U.S. 694, 701-702, 71 S.Ct. 954, 958, 95 L.Ed. 1299, or that an administrative agency 'may infer * * * such conclusions as reasonably may be based upon the facts proven,' Republic Aviation Corp. v. N.L.R.B., 1945, 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 557, cited with approval in Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 1954, 347 U.S. 17, 49, 74 S.Ct. 323, 98 L.Ed. 455. Respondents here did not adduce evidence compelling a rejection of the inference of unlawful purpose, as was done in N.L.R.B. v. Business Machine and Office Appliance Mechanics Conference, supra, at 559-561.
 
 
 14
 The Board might have chosen to limit its order to the three secondary employers at whose premises the union could have been found to have threatened the employees; but it could also have properly determined that the conduct demonstrated to have occurred at these locations might be repeated at others unless it phrased its order in general terms. N.L.R.B. v. Express Publishing Co., 1941, 312 U.S. 426, 437, 61 S.Ct. 693, 85 L.Ed. 930; Precision Fabricators, Inc. v. N.L.R.B., 2 Cir., 1953, 204 F.2d 567; Central States Drivers Council v. N.L.R.B., 1959, 105 U.S.App.D.C. 338, 267 F.2d 166; N.L.R.B. v. Brewery and Beer Distributor Drivers etc., 3 Cir., 1960, 281 F.2d 319, 322-323. Cf. Communications Workers of America, A.F.L.-C.I.O. v. N.L.R.B., 1960, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896. We note that the order is literally so broad as to include 'any other employer in the United States or any other place where the Board's writ may run,' 281 F.2d at page 323; however, we construe it as intended to be limited to the general area where K-C was operating.
 
 
 15
 Enforcement granted.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 The same Examiner had so defined the test in his report, which the Board adopted, in the Ready Mixed Concrete Co. case, supra, at 474
 
 
 [2]
 Here this was already sufficiently established by the circumstance that all of K-C's employees who visited the secondary employers' premises, with the single exception of the part-time driver, Bielecki, were owner-drivers who were well aware of the strike and were highly unlikely to be influenced by picketing as such
 
 
 [3]
 There might be a basis for a contrary conclusion if the Board's experience enabled it to say, as a factual matter, that secondary picketing not meeting the 'fifth condition' was so uniformly for a forbidden objective that the Board might permissibly draw that inference in all instances. Cf. the Board's decision as to exclusive union hiring halls, Mountain Pacific Chapter, 119 N.L.R.B. 883, 893 (1957); enforcement denied, N.L.R.B. v. Mountan Pacific Chapter, 9 Cir., 1959, 270 F.2d 425, 432; Morrison-Knudsen Co., Inc. v. N.L.R.B., 9 Cir., 1960, 276 F.2d 63; but see N.L.R.B. v. Local 176, United Brotherhood of Carpenters and Joiners, 1 Cir., 1960, 276 F.2d 583. However, neither the Washington Coca Cola opinion nor its successor seems to take that ground; Washington Coca Cola proceeds rather on the basis of a legal conclusion, which rather clearly goes beyond the authorities, that 'After 6 years of Board and court construction of Section 8(b)(4)(A) of the Act, the fundamental principle has been established that this section proscribes picketing at the separate premises of employers who are not a party to the picketing union's primary dispute.' 107 N.L.R.B. at 302, Cf. S.E.C. v. Chenery Corp., 1943, 318 U.S. 80, 92-93, 63 S.Ct. 454, 87 L.Ed. 626; S.E.C. v. Chenery Corp., 1947, 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995
 
 
 [4]
 There was testimony that such driver made between 20 and 40 stops a day