CARRIER CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 198, Docket 27079.

United States Court of Appeals
Second Circuit.

Argued Feb. 5, 1962.

Decided Oct. 18, 1962.

As Modified on Denial of Rehearing
Petitions.
Dec. 12, 1962.

Rehearing Denied in Banc
Dec. 12, 1962.

Lumbard, Chief Judge, dissented.

Theophil C. Kammholz, Chicago, Ill.
(Kenneth C. McGuiness, Washington, D.
C., David W. Jasper and John E. Lynch,

Syracuse, N. Y., on the brief), for petitioner.

Melvin J. Welles, N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Norton J. Come, Asst. Gen. Counsel, and Hans J. Lehmann, Washington, D. C., on the brief), for respondent.

Jerry D. Anker, Washington, D. C. (David E. Feller and Feller, Bredhoff & Anker, Washington, D. C., and Thomas P. McMahon, Buffalo, N. Y., on the brief), for United Steelworkers of America, AFL–CIO, and its Local Union 5895, interveners.

Gerald E. Dwyer, New York City, and Gregory S. Prince, Philip F. Welsh and Carl V. Lyon, Washington, D. C., on the brief for Association of American Railroads, amicus curiae.

Before LUMBARD, Chief Judge, and SWAN and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

On March 2, 1960, members of Local 5895, United Steel Workers of America, went on strike against Carrier Corporation. Carrier's plant is located in Syracuse, New York, and a substantial amount of its products are shipped from there in interstate commerce. Upon instituting the strike pickets were maintained at numerous entrances to the Carrier plant. A picket line was also established at a gate, described more fully hereafter, on a right of way owned by the New York Central Railroad. Based on charges by Carrier, the Board filed a complaint against the Union and its officers, alleging violations of §§ 8(b) (1) (A), 8(b) (4) (i) and 8(b) (4) (ii) (B) of the National Labor Relations Act. A hearing was held upon the complaint and the Trial Examiner found that the picketing violated § 8(b) (1) (A) of the Act. The Board entered an order on July 13, 1961, requiring the union to cease and desist from the violation and to take oth-

er appropriate action. The union does not contest this portion of the order, and a consent decree providing for its enforcement has been entered.[1]

The Trial Examiner also found that the picketing on the railroad right of way constituted a violation of §§ 8(b) (4) (i) and 8(b) (4) (ii) (B) of the Act, but the Board held, one member dissenting, that those sections had not been violated. By its petition in this court, Carrier seeks modification of this latter portion of the decision and order of the Board. The Association of American Railroads, as amicus curiae, has filed a brief supporting Carrier's petition. Local 5895 has intervened in support of the Board's position.

The question for decision is whether it is a violation of § 8(b) (4) (i) and (ii) (B) for a union to picket a railroad right of way adjacent to the employer's premises, when it is the manifest objective of such picketing to prevent employees of the railroad from handling the goods of the struck employer in the course of regular delivery and removal operations. In agreement with the Trial Examiner and the dissenting member of the Board, we hold that it is.

The facts, as stated by the Board, are as follows:

"As described in more detail in the Intermediate Report, the Carrier plant was bounded on the west by Thompson Road, and immediately south of the plant and extending in an east-west lateral was a spur of the New York Central, running easterly from the Lake Line of the railroad across Thompson Road. This spur was used to serve Carrier and other plants in the adjacent area. The railroad right-of-way, *which was owned by the railroad,* was enclosed by a chain link fence along its south boundary, which fence was a continuation of one enclosing Carrier property along Thompson Road.

---

1. It is unnecessary to refer further to this portion of the Board's order.

Access to the right-of-way was provided by a chain link gate immediately east of the point where the spur crossed Thompson Road.[2] On March 11, pursuant to arrangements made with Carrier the previous day, the railroad, under the operation of supervisory personnel, undertook to 'spot' 14 empty boxcars at the Carrier plant and pick up a like number of loaded cars. In carrying out this work, the train made several passages through the Thompson Road gate, and it was at this point that the conduct complained of took place. The Trial Examiner found that by maintaining pickets at the Thompson Road railroad gate, by threatening railroad personnel, and by blocking the train's passage with the object of forcing or requiring the New York Central to cease handling or transporting Carrier products and otherwise doing business with Carrier, the Respondents violated Section 8(b) (4) (i) and (ii) (B) of the Act."

Section 8(b) (4) of the National Labor Relations Act, as amended by 73 Stat. 542 (1959), 29 U.S.C.. § 158(b) (4), is one of the provisions of the Act directed against secondary boycotts. N.L.R.B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 686, 71 S. Ct. 943, 95 L.Ed. 1284 (1951). Its purpose is to prevent the enlargement of labor disputes which occurs when a neutral bystander is enmeshed in a controversy not his own. To this end, unions are prohibited from bringing certain pressures to bear on neutral employers and their employees, pressures which have as their goal that of forcing these secondary parties to break off business relations with the primary employer. The language of

the Act is broad enough to apply whether the forbidden objective is brought about directly, as by interference with suppliers or customers of a struck employer, Local 1976, United Brotherhood of Carpenters and Joiners v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), or indirectly, as by interference with third party suppliers or customers of a neutral employer who, by these pressures, is forced to break off dealings with the primary employer. United Brotherhood of Carpenters and Joiners (Wadsworth Building Co.), 81 N.L.R.B. 802 (1949).

Section 8(b) (4) makes it an unfair labor practice for a union:

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \* *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing \* \* \*."[3]

---

2. The Trial Examiner's findings show that this gate was padlocked when not opened for railroad switching operations. Railroad personnel held the key to the gate, which could also be opened by a master key, held by Carrier employees, to locks

on Carrier property. Carrier employees were not permitted to use this gate to get access to the Carrier plant.

3. Prior to the amendment of Section 8(b) (4) in 1959, the substantive provisions of Section 8(b) (4) (B) were found in Sec-

It is clear that the activities here in question violate the statute if the statute is read literally. Since the earliest days of the Taft-Hartley Act, however, these sections and their predecessor section prior to the 1959 amendments, § 8(b) (4) (A), have received a complex interpretive gloss. "Section 8(b) (4) must be interpreted and not merely read literally." Seafarers Int. Union, etc. v. N. L. R. B., 105 U.S.App.D.C. 211, 265 F.2d 585, 591 (1959). "This provision could not be literally construed; otherwise it would ban most strikes historically considered to be lawful, so-called primary activity." Local 761, Int. Union of Electrical, Radio & Machine Workers v. N. L. R. B., 366 U.S. 667, 672, 81 S.Ct. 1285, 1288, 61 L.Ed.2d 592 (1961).

The basic difficulty one encounters with a literal reading is that traditional picketing around the premises of an employer with whom a union has a dispute almost inevitably involves some interference with the relations between that employer and his suppliers or customers. "A strike, by its very nature, inconveniences those who customarily do business with the struck employer." Oil Workers Int. Union (Pure Oil Co.), 84 N.L.R.B. 315, 318 (1949). "The cases recognize the very practical fact that, intended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers." Seafarers Int. Union, etc. v. N. L. R. B., 105 U.S.App.D.C. 211, 265 F.2d 585, 590 (1959). Thus, "[i]t is

clear that, when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment (deliverymen and the like) have to enter the premises." Id. at 591.

Moreover, it was clear from the legislative history of the Act and was made explicitly clear by the 1959 amendments that Congress did not, by § 8(b) (4), intend to outlaw traditional primary strike activity or traditional methods of picketing.

To accommodate the apparent conflict between the literal language of the statute on the one hand, and, on the other, the Congressional purpose, the Board and the courts have evolved the "primary-secondary activity" distinction. The line that has been drawn between the two kinds of activity has been uncertain and wavering, involving distinctions "more nice than obvious." Local 761, Int. Union of Electrical, Radio & Machine Workers, supra 366 U.S. at 674, 81 S.Ct. at 1290. What is worse, the conceptual dichotomy has been ambiguous. In some cases decision as to whether union activity was "primary" or "secondary" has turned on whether the activity was encompassed within a literal reading of the act or affected secondary employers, and it was immaterial to the result whether the activity was, in the end, held to be unlawful under § 8(b) (4). N. L. R. B. v. Business Machine &

tion 8(b) (4) (A) of the Taft-Hartley Act, which reads as follows:
"(b) It shall be an unfair labor practice for a labor organization or its agents
— * * *
"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any

employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person." 61 Stat. 136 (1947).
All of the cases cited in this opinion have dealt with labor practices which occurred *prior* to the 1959 amendments. We do not consider this fact to be material, however, since both the purpose and effect of the amendment would appear to be that of *strengthening* rather than weakening the Act's proscriptions against secondary boycott activities.

Office Appliance Mechanics Conference Board (Royal Typewriter Co.), 228 F.2d 553 (2 Cir. 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. In other cases, the labels "primary" and "secondary" were purely conclusionary appellations, the choice of label turning upon whether a particular activity or complex of activities was ultimately held to violate, or to be immune from, the proscriptions of § 8(b) (4). Int. Brotherhood of Teamsters, Local 807 (Schultz Refrigerated Service), 87 N.L.R.B. 504 (1949). In all events, where picketing was limited to the premises of the primary employer, the Board and the courts, by adopting this distinction between primary and secondary activities, exempted from the proscription of § 8(b) (4) many activities covered by the subsection's literal language. United Electrical, Radio and Machine Workers (Ryan Construction Corp.), 85 N.L.R.B. 417 (1949); Di Giorgio Fruit Corp. v. N. L. R. B., 89 U.S.App.D.C. 155, 191 F.2d 642, 28 A.L.R.2d 377 (1951); Milwaukee Plywood Co. v. N. L. R. B., 285 F.2d 325 (7 Cir. 1960); cf. Local 761, supra. These cases are not dispositive of the issue before us, inasmuch as here the union's activities took place not on the premises of the Carrier Corporation but on an adjacent right of way owned by the New York Central Railroad.

However, exceptions to a literal reading of the proscriptions of § 8(b) (4) have not been limited to cases of picketing on the premises of the primary employer. Occasionally, the job site in relation to which a dispute arises is located on the premises of a neutral third party. In such circumstances the unions involved have claimed their traditional right to picket at the job site. To deal with this class of cases the Board has utilized a "situs of the dispute" concept. Although the situs of the dispute is normally at the premises of the primary employer, an application of this concept permits extension, in appropriate circumstances, of traditional union activity to neutral construction sites, N. L.R.B. v. Denver Building & Const.

Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), to ambulatory vehicles in the trucking industry, Int. Brotherhood of Teamsters, Local 807 (Schultz Refrigerated Service), supra, or to a ship moored at the dry dock of a neutral employer, Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547 (1950). Within limitations to be discussed hereafter, picketing at such places has, in some cases, been held lawful under the act, even though incidental injury has been suffered by neutral employers occupying the common situs. But these "common" or "ambulatory" situs cases are no more dispositive of the issue before us than are those cases involving the picketing of the primary employer's premises, for no employee of Carrier Corporation worked on the railroad right of way either before or during the strike.

Indeed, we find no controlling authority to enlighten us, and, absent controlling authority, we must find our decisional guidelines behind the disparate facts of prior dissimilar cases. In doing so, we are mindful of the warning of the Supreme Court in Local 1976, United Brotherhood of Carpenters & Joiners v. N. L. R. B., 357 U.S. 93, 99–100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958):

> "It is relevant to recall that the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests. This is relevant in that it counsels wariness in finding by construction a broad policy against secondary boycotts as such when, from the words of the statute itself, it is clear that those interested in just such a condemnation were unable to secure its embodiment into enacted law."

We are aware, no less, that "[t]he nature of the problem, as revealed by un-

folding variant situations, inevitably involves an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer." Local 761, supra, 366 U.S. at 674, 81 S.Ct. at 1290. Nevertheless, distrust of quick formulae does not lead us to the opposite evil of overreliance upon finely spun factual distinctions having no basis in legislative history or in reason. Ours is the task of principled decision and Congress could have intended no less when it enacted the statute and placed upon us the duty to review orders of the Board thereunder.

Relevant prior constructions of § 8(b) (4) can best be understood, perhaps, when divided into two time periods.

## I

The first period, beginning with the enactment of the Taft-Hartley Act in 1947, and terminating in 1952, may be characterized by relatively narrow constructions of § 8(b) (4) by the N.L.R.B. The cases may be further subdivided into those involving picketing at the premises of the primary employer and those involving picketing at neutral premises.

From the earliest cases, the Board ruled that all picketing at the premises of the primary employer was immune from the proscriptions of § 8(b) (4) (A). Relying on the legislative history rather than the language of the statute, the Board maintained this position, even when it was clear that the picketing could have no appeal but to employees of neutral employers. Thus, in United Electrical, Radio and Machine Workers (Ryan Construction Corp.), 85 N.L.R.B. 417 (1949), the union, in support of its dispute with the primary employer Bucyrus, picketed the entire Bucyrus premises, including a separate gate that had been cut through the fence to provide ingress for Ryan employees to the site of a construction project Ryan was performing for Bucyrus. Ruling that the activity was "primary picketing" outside the proscriptions of § 8(b) (4) (A), the Board stated that the provision "was intended only to outlaw certain secondary boycotts, whereby unions sought to enlarge the economic battleground beyond the premises of the primary employer. When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, an object of the picketing is to dissuade all persons from entering such premises for business reasons." Id. at 418. And see Oil Workers Int. Union (Pure Oil Co.), 84 N. L.R.B. 315 (1949).

Where picketing activities had taken place on *neutral* premises, the early cases were in substantial confusion. In some, the Board, still conceding the existence of the objective proscribed by the Act, attempted to carve out a new and broader geographical area of immunity based, now, on the notion of "the situs of the dispute," or "the area of primary conduct." Thus, in Int. Brotherhood of Teamsters, Local 807 (Schultz Refrigerated Service), 87 N.L.R.B. 504 (1949), Schultz had moved its place of business from New York City to New Jersey, replacing members of Local 807 by drivers from a New Jersey local. In ruling that the displaced drivers might picket around the trucks while they were being loaded or unloaded at the premises of New York City customers, the Board stated:

"Plainly, the object of all picketing at all times is to influence third persons to withhold their business or services from the struck employer. *In this respect there is no distinction between lawful primary picketing and unlawful secondary picketing proscribed by § 8(b) (4) (A).* Necessarily then, one important test of the lawfulness of a union's picketing activities in the course of its dispute with an employer is the identification of such picketing with the actual functioning of the primary employer's business at the *situs* of the labor dispute." Id. at 505. (Emphasis added.)

Within this "area of primary conduct," therefore, the union could "lawfully per-

suade all persons, including in this case the employees of Schultz' customers and consignees, to cease doing business with the struck employer." Id. at 504. In Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547 (1950), the Board imposed limitations, in the form of the often-quoted "Moore Dry Dock Conditions," upon a union's right to picket at the situs of a dispute located on neutral premises:

> "In the kind of situation that exists in this case, we believe that picketing of the premises of a secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the *situs* of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer." Id. at 549.

The limitations were designed, once again, to prove less the issue of intent *under* the statute, however, than to isolate spatio-temporal areas of exemption *from* its operation. The rationale justifying this approach was the underlying intent of Congress, in enacting § 8(b) (4) (A), not to interfere with traditional "primary activities" of striking unions.

Although Schultz and Moore Dry Dock are consistent with the Board's approach to contemporaneous cases involving the picketing of a primary employer's premises, they are not easily reconciled with three closely-preceding "neutral" or "common-situs" Board decisions: Local 74, United Brotherhood of Carpenters

(I. A. Watson Co.), 80 N.L.R.B. 533 (1948); Int. Brotherhood of Electrical Workers, Local 501 (Samuel Langer), 82 N.L.R.B. 1028 (1949); and Denver Building and Const. Trades Council, 82 N.L. R.B. 1195 (1949). All three involved disputes concerning the use of non-union employees at construction sites. In the Watson case, the owner of certain premises contracted with members of the respondent union to renovate a dwelling. Subsequently, the owner contracted with the Watson Co., an employer of non-union labor whom the respondent had unsuccessfully sought to organize in the past, to install wall and floor coverings in the project. When an officer of the respondent learned of the situation, he ordered members of the union off the job. In Langer and Denver the general contractors of construction projects were the ones who subcontracted portions of the jobs to employers of non-union men. The respondent unions again had had long-standing disputes with the errant subcontractors in each case. When the construction sites were picketed, union employees of other subcontractors walked off the job. In each of these three cases the Board, without hesitation, found a violation of § 8(b) (4) (A), despite the fact that picketing was limited to the situs of the dispute and met the soon-to-be-announced Moore Dry Dock criteria for picketing neutral premises. Rather than relying on the primary-secondary activity distinction, the Board founded its complaint, in each case, upon the fact that an objective of the unions' actions was to force the general contractors in Denver and Langer, and the owner in Watson, to cancel their contracts with the subcontractor-employers of non-union men.

Toward the end of this first period,[4] the Supreme Court, in four decisions

---

4. Two Board decisions during the period dealt with union activities at places which were neither the premises of the primary employer nor the situs of the dispute. In Amalgamated Meat Cutters & Butchers Workmen (Western, Inc.), 93 N.L. R.B. 336 (1951) the Board ruled without hestitation that it was violative of § 8(b) (4) (A) for union members to go to the premises of neutral customers there to encourage their employees to refuse to handle the primary employer's meat products. In Newspaper & Mail Deliverer's Union (Interborough News Co.), 90 N.L.R.B. 2135 (1950), however, where union members had gone to the premises of neutral suppliers to encourage their employees not to deliver news-

handed down on June 4, 1951, took the opportunity to review the early Board interpretations of § 8(b) (4) (A). In N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284 (1951), members of the International Brotherhood of Teamsters had picketed the premises of the Kaplan Rice Mills, Inc. for purposes of securing recognition of the union as the collective bargaining representative of the mill employees. During the course of their picketing, the members sought to encourage the drivers of the truck of a neutral customer to refrain from entering the premises to pick up an order of goods. Citing Oil Workers Int. Union (Pure Oil Co.), supra, the Board had dismissed the complaint on the ground that the union's activities were merely *"primary* picketing" of the Kaplan mill and were carried out in the immediate vicinity of the mill. Although approving the Board's dismissal of the complaint, the Court rested its action upon a wholly different rationale from that enunciated by the Board in Ryan and Pure Oil:

> "The limitation of the complaint to an incident in the geographically restricted area near the mill is significant, although not necessarily conclusive. The picketing was directed at the Kaplan employees and at their employer in a manner traditional in labor disputes. Clearly, that, in itself, was not proscribed by § 8(b) (4). Insofar as the union's efforts were directed beyond that and toward the employees of anyone other than Kaplan, there is no suggestion that the union sought *concerted* conduct by such other employees. 341 U.S. 671 [71 S.Ct. 964].

> "A sufficient answer to this claimed violation of the section is that

the union's picketing and its encouragement of the men on the truck did not amount to such an inducement or encouragement to 'concerted' activity as the section proscribes." Id. at 670 [71 S.Ct. 964].

> "A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of § 8(b) (4), and they do not here." Id. at 671 [71 S.Ct. 964].

Although the Court's specific *ratio decidendi* in International Rice was not to survive the 1959 amendments by which the requirement of § 8(b) (4) that "concerted" action be encouraged was eliminated,[5] its basic approach to the case was to have profound effects upon subsequent constructions of the statute. No longer were there geographical areas exempted from the operation of § 8(b) (4). Analysis of the legitimacy of union activities was to proceed by an examination of *intent* or *objectives* when neutrals were threatened harm by a labor dispute not their own.

The remaining three cases decided by the Court on June 4, 1951, together with International Rice, furthered this analysis in the context of "common situs" picketing. In N. L. R. B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Int. Brotherhood of Electrical Workers, Local 501, etc. v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); and Local 74, United Brother-

---

papers to the primary employer's news stands, the Board found no violation on the ground that the conduct "invited action *only* at the premises of the primary employer." Id. at 2135. The union entreaties to neutral employees sought *inaction*, however, rather than action. That being the case, we find it anomalous to locate the response to the entreaties

at one place rather than another. We are unable, thus, to distinguish Interborough from subsequent contrary Board rulings in Western, Inc., supra, and Chauffeurs, Teamsters & Helpers, Local 175 (McJunkin Corp.), 128 N.L.R.B. 522 (1960).

5. See footnote 3, supra.

hood of Carpenters & Joiners of America v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (1951), the Court approved the Board's finding below of a violation of § 8(b) (4) (A) in Denver, Langer and Watson, respectively. In finding that the statute had been violated the centrality of the unions' objectives was emphasized:

"It was an object of the strike to force the contractor to terminate Gould & Preisner's subcontract.

"We hold * * * that a strike with such an object was an unfair labor practice within the meaning of § 8(b) (4) (A).

"It is not necessary to find that the *sole* object of the strike was that of forcing the contractor to terminate the subcontractor's contract. This is emphasized in the legislative history of the section.[18]

---

"18. Senator Taft, sponsor of the bill, stated in his supplementary analysis of it as passed: 'Section 8(b) (4), relating to illegal strikes and boycotts, was amended in conference by striking out the words "for the purpose of" and inserting the clause "where an object thereof is." ' **93** Cong.Rec. 6859."

Denver Building & Construction Trades Council, supra, 341 U.S. at 689, 71 S.Ct. at 951.

Though these four decisions handed down by the Supreme Court on June 4, 1951, set the basic approach to subsequent constructions of the statute, fundamental problems still remained. To find a violation of § 8(b) (4) it was sufficient that *an* object of a union's actions was to interfere with business relations between the primary employer and neutral third parties. However, the Board had recognized, as Judge Prettyman stated some years later, that "when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment * * * have to enter the premises." Seafarers

Int. Union, etc. v. N. L. R. B., 105 U.S. App.D.C. 211, 265 F.2d 585, 591 (1959). It was clear, thus, that harm to neutral employers could be justified under the Act, not because the harm occurred at exempted locations, but only if it occurred as an incidental effect of the union's pursuit of legitimate strike objectives. N. L. R. B. v. Service Trade Chauffeurs, etc., Local 145, 191 F.2d 65, 67 (2 Cir. 1951). It remained (1) to identify the strike objectives which under the Act were legitimate as distinguished from hoped-for results which if incidentally accomplished, could be permissible but which could not be independently pursued, and (2) to establish evidentiary guidelines by which the true objectives of union activity could be ascertained in the absence of an admission of illegal intent.

## II

During the second of the time periods, 1952 to date, into which we have separated the decisions construing § 8(b) (4), substantial progress was made in solving the two problems mentioned above. Concomitant with that progress the statute received broader readings from the Board and the courts.

The leading case of the period was Brewery and Beverage Drivers and Workers, Local 67 (Washington Coca Cola Bottling Works, Inc.), 107 N.L.R.B. 299 (1953). There, the respondent union, after calling a recognitional strike against Washington Coca Cola, picketed not only the plant, but the company's delivery trucks as they made their rounds to customers' premises. Although the activity appeared to comply with the four Moore Dry Dock criteria for picketing an ambulatory situs of dispute, and closely paralleled approved union activities in Schultz Refrigerated Service, supra, it was held by the Board to constitute a violation of § 8(b) (4) (A). Prior cases were distinguished on the ground, primarily, that in them, unlike in Washington Coca Cola, the primary employer had no permanent place of business at which the union could adequately publicize its dispute.

The rationale underlying this new limitation on neutral premises picketing was not immediately clear. What came to be known as the "Washington Coca Cola doctrine," however, was articulated in a series of Board decisions over the following seven or eight years. In Int. Brotherhood of Teamsters, Local 659 (Ready Mixed Concrete Co.), 116 N.L.R.B. 461 (1956), the Board found a violation of § 8(b) (4) (A) on facts closely similar to those in Washington Coca Cola. The Trial Examiner had stated, with the approval of the Board, that:

"* * * the Board in ambulatory situs situations, such as exist generally in the transportation industry * * * has in effect added to the four expressed in Moore Drydock, a fifth condition and one that the Respondents' picketing * * * fails to satisfy. That fifth condition is substantially this: that such picketing at neutral premises (as of trucks of a primary employer while making deliveries to customers) will not be regarded as privileged primary picketing absent a showing that the primary employer has in the vicinity no permanent establishment that may be picketed effectively. Washington Coca Cola Bottling Works, Inc. * * *" Int. Brotherhood of Teamsters, Local 659 (Ready Mixed Concrete Co.), 116 N.L.R.B. 461, 473 (1956).

The reason behind this fifth condition was stated by the Examiner as follows:

"Where, as in the Schultz Refrigerated Service case, supra, a primary employer has no fixed location in the vicinity where its employees may adequately be reached by picketing, then due regard for the right of the union to picket effectively * * * provides sufficient justification for permitting picketing of the primary employer at the location where the traveling work situs comes to rest, and any involvement of neutral employers and their employees may then appropriately be viewed as but a necessary incidental effect of lawful primary action * * * But where, as here, the employer has a fixed place of business in the area of the dispute at which its employees can be and are approached with the identical message the Union would deliver to the same employees at the premises of the secondary employers, the scales tip the other way. For now, the only detriment the Union would suffer by forbidding extension of its picketing to customers' job sites while deliveries are being made would be the foreclosure of what otherwise would be an added opportunity to enlist the aid of others not directly concerned with its dispute." Id. at 474.

Although the Washington Coca Cola doctrine was first articulated in ambulatory situs cases, its rationale was extended to all cases threatening involvement of neutral employers and their employees. Thus, in Retail Fruit and Vegetable Clerks Union, Local 1017 (Crystal Palace Market), 116 N.L.R.B. 858 (1956), the employer with whom the union was involved in a dispute owned a large market hall and operated several stands therein, leasing the remaining stands to neutral third parties. When a strike was called against the primary employer, the union was given permission to picket at the particular stands operated by him, but chose, rather, to picket at several general entrances to the market hall. In holding these activities outside the standards established for common situs picketing, and thus violative of § 8(b) (4), the Board stated: "In developing and applying these standards, the controlling consideration has been to require that the picketing be so conducted as *to minimize its impact on neutral employers insofar as this can be done without substantial impairment of the effectiveness of the picketing in reaching the primary employees.*" Id. at 859 (emphasis in original).

The principle underlying Washington Coca Cola was extended to reach picket-

ing of the premises of a primary employer even when the premises did not harbor neutral employers or their employees. In Chauffeurs, Teamsters and Helpers Local 175 (McJunkin Corp.), 128 N.L.R.B. 522 (1960), members of the striking union had picketed only one of ten entrances to the plant of the primary employer, that being a trucking entrance not normally used by employees of the plant. The Board held that action to be violative of § 8(b) (4) when combined with (1) the sending of "hot cargo" letters to neutral carriers with whom the primary employer dealt, and (2) one direct approach to neutral employees at their place of work requesting that they not handle the goods of the primary employer:

> "Where a union * * * sets out on a concerted effort to keep neutral employers from doing business with the primary employer by encouraging and inducing the employees of those neutral employers, 'it would be manifestly unrealistic not to take into consideration the total pattern of conduct' engaged in by the union

when passing upon particular incidents of inducement. If the totality of the union's effort is intended to accomplish a proscribed objective by inducements of secondary employees, then each particular inducement, being a component part of that total effort, must be adjudged as unlawful. 128 N.L.R.B. at 525." (Footnotes omitted).[6]

The pattern thus becomes clear.

A. The roots of the Washington Coca Cola doctrine lay in the Supreme Court's insistence that the gravamen of any complaint under § 8(b) (4) is a union's pursuit of a *forbidden objective.*

B. The *legitimate* objectives of primary strike or picketing activity were identified. These were repeatedly stated to be "reaching the primary employees," Crystal Palace Market, supra at 859, "publiciz[ing] its labor dispute in a traditional way among employees primarily interested," Ready Mixed Concrete Co., supra at 474, "communicat[ing] to employees of the primary employer its picketing message," Ibid.[7]

6. Although our purpose in quoting from the Board's opinion in the McJunkin case is to demonstrate the approach the Board had toward situations like the one before us, both the Board and the intervenor Union have called our attention to the subsequent judicial history of the case as demonstrating that our quotation of the Board's clearly expressed rationale of discussion is of no present moment.

The Union petitioned the Court of Appeals for the District of Columbia to review the Board's order. The Board cross-petitioned seeking full enforcement. Teamsters Local Union No. 175 v. N. L. R. B., 111 U.S.App.D.C. 65, 294 F.2d 261 (1961). The court unanimously held that the Union, in aid of a strike against a distributor of industrial products, McJunkin, clearly violated § 8(b) (4) (A) as amended, when, at the premises of a neutral employer trucking concern, it induced the employees of that trucking company not to unload a McJunkin truck for transshipment. Nevertheless, a divided court, Chief Judge Miller dissenting, also held it was not unlawful for the Union to pursue the same objective by picketing at a separate entrance to the struck employer's plant. The court's opinion is a one paragraph per

curiam and the opinion may have more importance than is presently evident, but it would appear that the results that the District of Columbia court reached (even though relying upon a distinction that appears to be without a difference) are consistent with the results we reach here, for they held, as we do, that it is an unlawful objective for a Union to induce employees of a secondary employer to engage in a secondary boycott when the inducement so to do is conducted, as here, on the secondary employer's premises.

7. It is obvious that some strike or picketing objectives lie fully outside the language of the section, which applies only to coercion of persons "engaged in commerce" or to inducement to "employees" in the course of their employment. It has been held, therefore, that union attempts to publicize a dispute to the general consuming public or directly to employers themselves (where the attempts are peacefully carried out) are immune from the proscriptions of the Act. N. L. R. B. v. Business Machines & Office Appliance Mechanics, etc., Local 459, 228 F.2d 553 (2 Cir., 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483;

C. Involvement of the employees of *neutral* employers was permissible only if merely incidental to the pursuit of a legitimate primary objective.

D. Most important, the doctrine required that picketing be conducted in such a manner and at such a place as to minimize its impact on neutral employees insofar as this could be done without substantial impairment of the effectiveness of the picketing in reaching the primary employees. Actions beyond that minimum were to be interpreted as a pursuit of objectives forbidden by the Act and thus violative of its provisions.[8]

The relevance of these principles to the issue before us is clear. In picketing the railroad right of way adjacent to the Carrier plant, the union was not furthering its legitimate objective of publicizing its dispute to Carrier employees. Eight gates on the employer's premises existed, and were picketed, for this purpose. Carrier employees, prior to the strike, were not permitted access to the plant through the gate on the railroad right of way. In picketing on the railroad right of way the union demonstrated that its manifest, and *sole*, objective was to induce or to encourage railroad employees, or to coerce the railroad, to refuse to handle Carrier goods or otherwise to deal with the pri-

mary employer. Such results, although permissible when merely incidental to the pursuit of legitimate objectives, Di Giorgio Fruit Corp. v. N.L.R.B., 89 U.S. App.D.C. 155, 191 F.2d 642 (1951), here involved no such redemptive feature. The actions of the union were thus in violation of § 8(b) (4) (i) and (ii) (B) of the Act.

### III

Where the picketing of neutral or secondary premises has been at issue, the courts of appeals have repeatedly ruled in a manner consistent with the principles set forth above. See, e.g., N.L.R.B. v. United Steelworkers of America, Local 5246, 250 F.2d 184 (1 Cir., 1957); N.L.R.B. v. General Drivers, Salesmen, Warehousemen & Helpers, Local Union 984, 251 F.2d 494 (6 Cir., 1958); Brewery & Beverage Drivers, etc., Union v. N.L.R.B., 95 U.S.App.D.C. 117, 220 F.2d 380 (1955); N.L.R.B. v. Associated Musicians, etc., Local 802, 226 F.2d 900 (2 Cir., 1955).

In Seafarers International Union, etc. v. N.L.R.B., 105 U.S.App.D.C. 211, 265 F. 2d 585 (1959), however, the Court of Appeals for the District of Columbia Circuit denied enforcement of an order of the Board which was clearly required by these principles. The union's dispute in that case was with Salt Dome, the oper-

Rabouin v. N. L. R. B., 195 F.2d 906 (2 Cir., 1952); Crowley's Milk Company, Inc., 102 N.L.R.B. 996 (1953).

8. We view the decision and order of the Board in the case before us as a departure from these principles. Another Board departure may be found in Local 861, IBEW (Plauche Electric, Inc.), 135 N. L. R. B. No. 41, 49 LRRM 1446 (Jan. 12, 1962). There, although the struck employer had a place of business where his employees reported at the beginning and end of each day and where those employees could have been reached by traditional primary picketing, union members picketed a common job site elsewhere owned by a neutral employer. Despite this, the Board, two members dissenting, held the union activities at the common job site lawful under § 8(b) (4). The opinion written for the three member majority stated the majority was "overruling *Washington Coca Cola* to the

extent it is inconsistent," but the opinion offers no hint of a theory to justify its result, save a distaste for "rigid rules" and a new understanding of a supposed congressional intent. The opinion indicates that picketing strikers are still forbidden to have, as even *one* of their objectives, the objective of affecting the conduct of employees of secondary employers and if results adverse to neutral employers occasioned by the picketing do occur, they can only be justified if they are "incidental results." We find nothing in the opinion to demonstrate that the union had any legitimate reason for extending its picketing activities beyond the primary employer's regular place of business in the locality. All the fact patterns are the same as those in *Washington Coca Cola*. Only the Board's expertise in labor-management affairs appears to have taken a new direction with the advent of a new decade.

ator of a ship used in offshore oil drilling in the Louisiana tidelands of the Gulf of Mexico. When the ship was taken to the neutral Todd shipyard for overhaul and repairs, members of the union began picketing outside the shipyard gates. (They had been denied the right to picket on the wharf immediately alongside the vessel.) Two days after the picketing began, Salt Dome removed all its non-supervisory employees from the ship; the picketing continued, however, for more than a week thereafter. As a result of this activity employees of the Todd shipyard refused to work on the Salt Dome vessel although they continued with other work about the yard. The Board ruled that by picketing after the removal from the ship of all Salt Dome's non-supervisory employees, the union revealed that its actions were directed not to fellow employees of Salt Dome, but to the neutral employees of Todd.

In reversing the Board's finding of a § 8(b) (4) violation upon these facts, the Court agreed that "[t]he question is the objective. In the case at bar, if the objective of the strike encompassed Salt Dome only, it was legal. If its objective was partly Todd or its employees, it was illegal. The difference is in whether the effect on Todd's workers was an objective of the strike or was merely an incident of it." 265 F.2d at 590. The court introduced a new test, however, for determining, in the absence of admissions by the union of an illegal intent, the objectives of picketing elsewhere than on the primary employer's premises:

"Here Todd, the unoffending employer, bore no more adverse effects than it would have suffered had it been working on the Pelican [Salt Dome's ship] at a dock owned by Salt Dome several miles away and had the picketing been at that dock. If such had been the case, Todd's employees would have refused to cross the line in order to work on the Pelican * * *. Such picketing would undoubtedly have been legal. *Since the picketing in the case at bar cast upon Todd no greater adverse*

*effect than would thus have been the case,* its interest in preventing the picketing was not as great as the employees' interest in picketing what was the situs of the dispute." Id. at 592. (Emphasis added.)

" * * * Todd was under economic pressure * * *. But this pressure was the same sort as that felt by an employer when one of his major suppliers or customers is being picketed, or that which a contractor feels when a subcontractor is struck at a crucial point in construction." Id. at 591.

As we read the dissenting opinion, our colleague relies upon this same argument in the case before us. "It is * * * clear from the record that the picketing employees made no attempt to interfere with any of the railroad's operations for plants other than Carrier. The railroad employees were not encouraged, nor did they refuse, to serve the other plants. The picketing was designed to accomplish no more than picketing outside one of Carrier's own delivery entrances might have accomplished." To our minds, the crucial fallacy in this argument lies in the failure to distinguish between fully legitimate objectives of a union in picketing a primary employer's premises, and those hoped-for *results which are not permissible* unless only incidentally achieved.

It is clear that where a union engages in traditional picketing activities on the premises of the employer with whom it has a dispute, its actions may lawfully have the effect of encouraging employees of neutral suppliers or customers not to enter the premises. Di Giorgio Fruit Corp. v. N.L.R.B., 89 U.S.App. D.C. 155, 191 F.2d 642 (1951). The cases have uniformly held, however, that such attempts to influence neutral employees are lawful only if incidental to the independently legitimate objective of publicizing the union's dispute with the primary employer to the employees of that employer. After all, the language found in a statute is not wholly irrele-

vant to its proper construction. Because a harm may be permitted in one instance only because incidental to lawful activities, it is fallacious reasoning to hold that the same harm must be permitted in another instance where it is independently pursued. Neither logic nor the sense of the different economic situations indicates that such a result is justified. Insofar as the decision in Seafarers International Union, etc. v. N.L.R.B. supra, rests upon a line of reasoning we cannot accept, we find the case unpersuasive. Though the statute may permit economic harm to be suffered by a neutral when a union, in the progess of aggressively pursuing lawful objectives, incidentally occasions that harm, it does not follow that economic harm suffered by a neutral, independently occasioned by aggressive union activity, is also permissible under that statute.

Finally, counsel for the Board place great reliance upon the recent decisions of the Supreme Court in Local 761, International Union of Electrical, Radio & Machine Workers (General Electric Co.) v. N.L.R.B., 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed.2d 592 (1961). There, as in the Ryan case, supra, the union had picketed several entrance gates to the plant of the primary employer. One of these gates was used exclusively by employees of independent contractors who were utilized to perform various tasks on the premises. Although remanding the case for further findings of fact by the Board, the Court held such picketing of a separate gate to be violative of § 8(b) (4) so long as the independent workers were "performing tasks unconnected to the normal operations of the struck employer." Id. at 680, 81 S.Ct. at 1293. And see United Steelworkers v. N. L. R. B., 289 F.2d 591 (2 Cir. 1961).

The Court's holding in General Electric does not, of course, conflict with the result we here reach. In both cases union picketing activities are held to violate § 8(b) (4) of the Act because of their appeal to neutral employees. In General Electric, the picketing took place at the premises of the employer with whom the union was engaged in a dispute. The Supreme Court limited its finding of illegality, therefore, to circumstances in which the neutral employees were not engaged in work connected with the normal operations of the plant. In so limiting its holding the Court acknowledged the special solicitude of Congress and the Board that the statute not unduly restrict traditional picketing *at the premises of the primary employer*. Local 761 (General Electric), supra, 366 U.S. at 679, 681, 81 S.Ct. 1285.

In this case, however, the union activity occurred on the right of way of the New York Central Railroad. No special policy of greater latitude for picketing at the primary employer's premises thus comes into play, and no distinction based on the work performed by the neutral employees need be made.

We do not find in General Electric a policy of the Supreme Court to exempt from the Act's proscriptions all union attempts to keep deliveries from being made to a struck plant, wherever and however such attempts are made. Yet it is this position for which the Board now earnestly contends. Were we to accept such a doctrine, however, we should not be able to distinguish attempts to prevent deliveries from attempts directly to interfere with other business relations between the struck employer and his suppliers or customers. Congress might have written § 8(b) (4) to apply only to union interference with business relations between a struck employer's suppliers and customers and *their* suppliers and customers. It did not do so, nor have the courts failed to find violations of the Act where union activities directly interfered with relations between a struck employer and secondary parties dealing with him. See, e.g., Local 1976, United Brotherhood of Carpenters (Sand Door & Plywood Co.) v. N.L.R.B., 357 U.S. 93, 78 S. Ct. 1011, 2 L.Ed.2d 1186 (1958).

We do not read Local 761 (General Electric Co.) v. N.L.R.B., supra, to con-

flict with our disposition of the case at bar.

■ Nor do we find the decision of this court in N. L. R. B. v. Local 294, I. B. T. 284 2d 887 (2 Cir. 1960), to be inconsistent with the result herein. In that case which, like General Electric, was expressly decided under the law prior to the 1959 amendments to the Act, members of the respondent Union picketed trucks of the struck employer while pickups and deliveries were being made at neutral employers' premises. Although it was evident that the union activities were directed to *secondary* rather than primary employees, we ruled that under the Act prior to the 1959 amendments this fact would not be determinative of illegality unless the neutral employees were encouraged to engage in "a strike or a concerted refusal * * * to handle goods of or for the primary employer", 284 F.2d at 889 (citing N. L. R. B. v. International Rice Milling Co., supra). From requests which the strikers had made to the neutral employees not to handle the goods of the struck employer, we found the requisite inducement to concerted activity and granted enforcement of the Board order. Since the enactment of the 1959 amendments, however, as we have set forth more fully above, the inducement to *concerted* activity by neutral employees is no longer required for the proscriptions of § 8(b) (4) (A) to come into operation. The amended Act has been broadened by its terms to proscribe any inducement to any neutral employee not to handle the goods of the struck employer.

The petition of Carrier Corporation is granted.

SWAN, Circuit Judge.

I concur in the result of Judge WATERMAN'S opinion.

LUMBARD, Chief Judge (dissenting).

This case presents the question whether it is an unfair labor practice, prohibited by §§ 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, for a union to picket a railroad right of way adjacent to the employer's premises, while the railroad is engaged in normal delivery and removal operations in the behalf of the struck employer, if there is no point of entry into the latter's premises where the union can conduct such picketing. I would hold that picketing under such circumstances is not an unfair labor practice; accordingly, I dissent from the action of my colleagues in granting the employer's petition to modify the Board's order.

As I understand the cases in this area, the lawfulness of picketing depends on the legitimacy of the union's objective; the place where the picketing occurs is controlling only insofar as it sheds light on the union's objective. The legitimate objectives of picketing include publicizing a dispute to employees of neutral employers who are performing part of the everyday operations of the struck employer. Since the picketing which occurred here had that objective, and since there was no other place where the union could conduct such picketing, I agree with the National Labor Relations Board that there was no violation of the Act.

The railroad gate which was the locus of the disputed picketing affords access from Thompson Road, a public thoroughfare, to a right of way owned by the New York Central. The right of way is approximately thirty-five feet wide, and extends in an east-west direction along the southern boundary of the Carrier plant, which fronts on the eastern side of Thompson Road. New York Central maintains railroad tracks on the right of way which by a series of spurs service Carrier and several adjacent plants also east of Thompson Road. The gate was cut into a fence which surrounded the railroad's property on its southern boundary and was a continuation of a fence enclosing the Carrier plant along Thompson Road. It was padlocked when not open for railroad switching operations. Railroad personnel held the key to the gate, which could also be opened by a master key, held by Carrier employees,

to locks on Carrier property.[1] Carrier employees were not permitted access to the Carrier plant through the gate and right of way.

During the early days of the strike, the railroad provided regular service to the other plants located along the right of way. On March 10, about one week after the strike had commenced, Carrier made arrangements with New York Central for it to "spot" fourteen empty boxcars at the Carrier plant and remove the same number of loaded cars on the following day. On March 11, after the regular train crew had completed switching operations for other plants, supervisory personnel of the railroad who were willing to disregard the picket line took over the running of the train and started to perform the Carrier operations, which necessitated several switching maneuvers through the Thompson Road gate and onto Thompson Road. In the course of these operations, the striking Carrier employees congregated on Thompson Road outside the railroad gate, threatened railroad personnel running the train, and obstructed its passage by standing or lying in front of it and driving an automobile onto the track. These are the acts which Carrier claims were violations of §§ 8(b) (4) (i) and (ii) (B).

Section 8(b) (4) of the N.L.R.A., as amended by 73 Stat. 542 (1959), 29 U.S.C. § 158(b) (4), makes it an unfair labor practice for a union

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products' of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \* *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing \* \* \*."

It is evident that the acts complained of are covered by the terms of clauses (i) and (ii). It is equally plain that the objective of the striking Carrier employees was to prevent the railroad from performing its usual services for Carrier. However, the acts constituted "primary picketing" which is protected by the proviso in clause (B).

That primary picketing is not an unfair labor practice was first made explicit in the N.L.R.A. by the 1959 amendments to that Act. Before that time, § 8(b) (4) (A), the predecessor of the present provisions, if construed literally would have prohibited much picketing that lay within the domain of traditional union economic warfare. To avoid that result, unintended by Congress, § 8(b) (4) (A) was held to prohibit only "secondary" activity directed at someone other than the employer with whom the union had a grievance. The incidental coercive effects felt by a neutral employer when his employees refuse to cross a picket line were declared outside the statutory prohibition. See Oil Workers Int. Union (The Pure Oil Co.), 84 N.L.R.B. 315 (1949); United Electrical, Radio & Machine Workers (Ryan Construction Corp.), 85 N.L.R.B. 417 (1949); N. L. R. B. v. International Rice Milling Co., Inc., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284; N. L. R. B. v. Local 294, International Brother-

1. The right of way had been owned by Carrier, which deeded it to New York Central in 1949.

hood of Teamsters, 284 F.2d 887 (2 Cir. 1960).

But although a distinction between primary and secondary picketing was drawn, no ready criteria for differentiating the two were available. The problem did not yield to a "quick, definitive formula," but rather required the development of standards "on the basis of accumulating experience." Local 761, International Union of Electrical, Radio & Machine Workers v. N. L. R. B., 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 61 L.Ed.2d 592 (1961). In the first cases, the touchstone of decision was ownership[2] of the picketed premises. Picketing at a secondary employer's premises was held unlawful. E. g., United Brotherhood of Carpenters (Wadsworth Building Co.), 81 N.L.R.B. 802 (1949), enforced, N. L. R. B. v. United Brotherhood of Carpenters, etc., 184 F.2d 60 (10 Cir. 1950), cert. denied, 341 U.S. 947, 71 S.Ct. 1011, 95 L.Ed. 1371 (1951). Picketing at the primary employer's premises was allowed, even if it occurred at a gate reserved for the exclusive use of employees of a neutral contractor doing construction work on the premises. Ryan Construction Corp., supra. In Ryan, the Board said. "When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary'. * * *" Id. at 418. See also The Pure Oil Co., supra.

This simple ownership test of union objective proved too inflexible. Situations arose in which due regard for the union's right to use its traditional weapons, including the inducement of neutral employees to support a strike by respecting picket lines, required that picketing be permitted elsewhere than at the primary employer's premises. In International Brotherhood of Teamsters (Schultz Refrigerated Service, Inc.), 87 N.L.R.B. 502 (1949), the Board ruled that truck-driver employees could picket the primary employer's trucks when replacement drivers were loading or unloading them on or in front of customers' premises. In the Board's view, such picketing was primary activity because "in view of the roving nature of its business, [this was] the only effective means of bringing direct pressure on" the employer. Id. at 506. The employees were "acting in a manner traditional to employees in all other industries, who choose to stand before their place of employment and point out their replacements to the interested public as strikebreakers, and their employer as unfair." Id. at 507. In Sailors' Union of the Pacific (Moore Dry Dock Co.), 92 N.L.R.B. 547 (1950), the Board upheld picketing of a neutral employer's shipyard where the struck employer's ship was undergoing construction work, the union having requested and been refused permission to place pickets at the dock where the primary employer's ship was berthed. At the same time, in order to protect "the right of a secondary employer to be free from picketing in a controversy in which it is not directly involved," the Board laid down standards to be applied in these "common situs" cases. Id. at 549. The effect of these standards was to confine the picketing as narrowly as possible to the normal operations of the primary employer and to require the union to make plain that it had no dispute with the neutral employer.[3]

2. "Ownership" in this context, here and elsewhere in the opinion, refers not only to absolute legal title, but also to the occupation of premises through some legal right less than absolute ownership.

3. Picketing the premises of a secondary employer was declared to be "primary" if the following conditions were met: "(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer." Moore Dry Dock, supra, at 549. (Footnotes omitted.) Later Board decisions made explicit a further condition which, at least as a relevant factor, was implicit in the rationale which underlay the Dry Dock standards; it must be shown that there was no reasonable opportunity

By parity of reasoning it was held in other cases that the mere fact of ownership by the primary employer would not justify picketing which unreasonably interfered with the rights of neutral employers. In Local 55 (PBM), 108 N.L.R.B. 363, enforced N. L. R. B. v. Local Union No. 55, 218 F.2d 226 (10 Cir. 1954), the Board found a violation of § 8(b) (4) (A) when a union picketed a construction site owned by a general contractor on which employees of neutral subcontractors were working, because the union did not make clear that its dispute was solely with the general contractor. The Board said: " * * * [T]he fact that the picketing takes place at the situs of the primary employer's regular place of business rather than at an ambulatory situs is not controlling; in both situations, picketing at a common situs is unlawful if the picketing sign fails to disclose that the dispute is confined to the primary employer." PBM, supra, at 366. (Footnote omitted.) In Retail Fruit & Vegetable Clerks Union (Crystal Palace Market), 116 N.L.R.B. 856 (1956), enforced 249 F.2d 591 (9 Cir. 1957), the Board stated explicitly that the standards developed in Moore Dry Dock for common situs cases applied without regard to the ownership of the premises. It said: "We can see no logical reason why the legality of such [common situs] picketing should depend on title to property. The impact on neutral employees of picketing which deviates from the standards outlined above is the same whether the common premises are owned by their own employer or by the primary employer." Crystal Palace Market, supra, at 859.

A related development was the reversal of the rule announced in Ryan, supra,

pertaining to separate gate cases. In Crystal Palace Market, the Board overruled Ryan to the extent that it was inconsistent with the later case. Id. Thereafter, in United Steelworkers, etc. v. N. L. R. B., 289 F.2d 591 (2 Cir. 1961), we granted enforcement of a Board order finding a violation of § 8(b) (4) (A) in the picketing of a separate gate to the primary employer's premises, which gate was used exclusively by employees of neutral contractors doing construction work. The conditions which justified the finding of a violation were stated:

> "There must be a separate gate marked and set apart from other gates; the work done by the men who use the gate must be unrelated to the normal operations of the employer and the work must be of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations." Id. at 595.

This development of the distinction between primary and secondary picketing was reviewed and approved by the Supreme Court in Local 761, International Union of Electrical, Radio & Machine Workers v. N. L. R. B., 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed.2d 592 (1961), a separate gate case similar to United Steelworkers v. N. L. R. B., supra. General Electric maintained a separate gate to its premises for the use of employees of independent contractors doing a variety of tasks including construction and maintenance work. During a strike against General Electric, pickets were placed at this gate as well as other plant entrances. The Board held that by picketing a gate used only by employees of neutral employers, the union had violated § 8(b) (4) (A). The Supreme Court ap-

---

for the union to accomplish its lawful objectives by picketing the premises of the primary employer. See Brewery & Beverage Drivers (Washington Coca Cola Bottling Works, Inc.), 107 N.L.R.B. 299 (1953), affirmed, 95 U.S.App.D.C. 117, 220 F.2d 380 (1955); International Brotherhood of Teamsters (Ready Mixed Concrete Co.), 116 N.L.R.B. 461, 473 (1956). Still later, the Board declared

that failure to meet this condition was not conclusive but was only "one circumstance among others, in determining an object of the picketing." International Brotherhood of Electrical Workers (Plauche Electric, Inc.), 135 N.L.R.B. No. 41 (1962). See also N. L. R. B. v. Local 294, International Brotherhood of Teamsters, 284 F.2d 887 (2 Cir., 1960).

proved the tests laid down in United Steelworkers, and remanded the case to the Board for a determination whether the workers using the gate "performed conventional maintenance work necessary to the normal operations of General Electric." Local 761, supra, at 682, 81 S.Ct. at 1294.

In reaching its decision, the Court noted that its holding "would not bar the union from picketing at all gates used by the employees, suppliers, and customers of the struck employer." Id. at 680, 81 S.Ct. at 1293. The Court said:

"The Union claims that, if the Board's ruling is upheld, employers will be free to erect separate gates for deliveries, customers, and replacement workers which will be immunized from picketing. This fear is baseless. The key to the problem is found in the type of work that is being performed by those who use the separate gate. It is significant that the Board has since applied its rationale, first stated in the present case, only to situations where the independent workers were performing tasks unconnected to the normal operations of the struck employer—usually contruction work on his buildings. In such situations, the indicated limitations on picketing activity respect the balance of competing interests that Congress has required the Board to enforce. On the other hand, if a separate gate were devised for regular plant deliveries, the barring of picketing at that location would make a clear invasion on traditional primary activity of appealing to neutral employees whose tasks aid the employer's everyday operations." (Footnote omitted.) Id. at 680–681, 81 S.Ct. at 1293.

The pattern which emerges from these cases requires affirmance of the Board's ruling. It is true that none of them precisely anticipates the facts here. This case does not involve a common situs, since none of Carrier's employees worked on the New York Central premises. But so long as the picketing is strictly confined to the objectives which justify picketing a neutral employer's premises in common situs cases and involves no greater interference with the neutral employer than is involved there, I see no reason why the picketing should be labelled "primary" in one case and not in the other. Where there is not a common situs, the picketing is not necessary to publicize the dispute to the employees of the primary employer. But as the Supreme Court explicitly recognized in Local 761, it is as legitimate a union objective to publicize the dispute to neutral employees making deliveries and performing other ordinary services for the primary employer as it is to publicize it to his own employees. Nor is this the case hypothesized by the Supreme Court in Local 761, where the primary employer has established a separate delivery gate leading onto his own premises. But the controlling issue being always whether the union's objective was one within the traditional scope of primary picketing, I see no more reason to accept as conclusive an ownership test when it works against the union than when it works in its favor, if other facts point to a contrary result.

The majority's decision rests on the premise that the only lawful objective of picketing is to reach the employees of the primary employer. I am totally unable to square this with the Supreme Court's statement in Local 761, supra, that "appealing to neutral employees whose tasks aid the employer's everyday operations" is "traditional primary activity." Id. at 681, 81 S.Ct. at 1293. The majority denies that there is a conflict, saying that "in both cases union picketing activities are held to violate § 8(b) (4) of the Act because of their appeal to neutral employees." But the Supreme Court stated, again explicitly, that the picketing was not unlawful if, as here, it reached neutral employees who performed work "necessary to the normal operations" of the employer. Id. at 682, 81 S.Ct. at 1294.

The sole basis of distinguishing this case is that the gate involved here did not lead immediately to the primary em-

ployer's premises. Nowhere in the opinion in Local 761 can I find the "special solicitude" for picketing the premises of a primary employer which the majority finds, except insofar as the location of the picketing indicates its motive. So far as I can see, the majority's distinction between "fully legitimate objectives of a union in picketing a primary employer's premises, and those hoped-for *results which are not permissible* unless only incidentally achieved" is one of those "finely spun factual distinctions having no basis in legislative history or in reason" which the majority condemns. What the alleged distinction comes down to is that the union can seek to influence neutral employees at the premises of the primary employer and not elsewhere (which in this case means, of course, that it cannot use pickets to influence the railroad workers at all). But this makes the test not the union's objective but the location of the picketing, a test which the majority itself admits to be obsolete.

Of course the question of ownership will usually be of great significance. Legitimate union objectives can ordinarily be accomplished by picketing around the employer's premises. Such picketing is usually the most direct and a sufficient means of publicizing the union's grievance to customers and suppliers and their employees, who can then, if they choose, respect the picket line and support the union's cause. Ordinarily, therefore, if the union extends its pickets to other premises, there is a reasonable basis for the inference that the union has attempted more elaborate methods of interference with neutral employers and has sought to embroil them in a dispute not their own. But just as the facts of a particular case may be such that even picketing solely around the primary employer's premises does not conclusively demonstrate that the union has stayed within bounds, so there may be cases where picketing elsewhere does not justify the inference that the union has gone too far.

In this case, it is undisputed that the railroad's operations for Carrier were in furtherance of Carrier's normal business. It is equally clear from the record that the picketing employees made no attempt to interfere with any of the railroad's operations for plants other than Carrier. The railroad employees were not encouraged, to, nor did they, refuse to serve the other plants. The picketing was designed to accomplish no more than picketing outside one of Carrier's own delivery entrances might have accomplished. Because the fence surrounding the railroad's right of way was a continuation of the fence surrounding the Carrier plant, there was no other place where the union could have brought home to the railroad workers servicing Carrier its dispute with Carrier. This fact serves to distinguish the present case from those where a union, able to picket at company entrances, would commit an unfair labor practice if it were to picket the home bases of delivery services.

Carrier argues that it is inappropriate in this case to work a balance of interests between the union's right to engage in primary picketing and the neutral employer's right to be free of interference, because the picketing of the railroad gate was attended by threats and coercion of railroad personnel. Such conduct, it is urged, is prohibited in any event. But this misconceives the point at which the balance of interests becomes relevant. The proviso which protects primary activities relates to the prohibited objectives of clause (B). This makes plain that the distinction between primary and secondary picketing is based, as it was in cases arising under the statute prior to the 1959 amendment, on a consideration of the union's objectives. If further demonstration were needed, the legislative history of the 1959 amendments clearly indicates congressional approval of the earlier cases. See H.R.Rep. No. 741, 86th Cong., 1st Sess. 21 (1959); H. R.Rep. No. 1147, 86th Cong., 1st Sess. 38 (1959), U.S.Code Congressional and Administrative News 1959, p. 2318; 105 Cong.Rec. 16588–89 (Aug. 20, 1959) (analysis of Sen. Kennedy and Rep. Thompson). It is this distinction, not a

-distinction between peaceful and violent means, which adjusts the conflicting interests of the union and neutral employers for purposes of § 8(b) (4). If the union's objectives are within the ambit of primary picketing, there is no violation of § 8(b) (4) whatever the means employed. Some other provision of the act may, of course, be violated, as was the case here.[4]

Finally, it is urged that to uphold the union's activity in this case would thwart congressional intent in the 1959 amendments to extend the protection against secondary boycotts to railroads and their employees. Such protection was intended to be given. See 105 Cong.Rec. 16589 (Aug. 20, 1959) (analysis of Sen. Kennedy and Rep. Thompson); 105 Cong. Rec. 18022 (Sept. 3, 1959) (analysis of conference agreement by Rep. Griffin). But nothing in the statute or its history indicates an intent to give railroads greater protection in this regard than other employers because of their status as common carriers or for any other reason. The Board's order legitimates only that picketing directed at railroad operations which service the normal business of the primary employer; it does not legitimate all picketing of a railroad right of way located adjacent or near to the premises of a primary employer.

I would deny Carrier's petition to modify the Board's order.

### On Petitions for Rehearing.

SWAN, Circuit Judge.

The intervenors' petition for rehearing asserts that because I concurred in the result of Judge WATERMAN'S opinion "there is no opinion of the Court to guide the Board, the parties in this case, or the unions or employers who will inevitably find themselves in similar situations in the future." I concurred in the result not because I disagree with anything stated therein (I do not) but because Judge WATERMAN'S opinion failed to include certain additional grounds for affirmance which I thought relevant.

### On Petitions for Rehearing In Banc.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

### PER CURIAM.

All of the active judges concurring, except Judge CLARK, Judge SMITH and Judge HAYS, who vote to grant, the petition for rehearing *in banc* is denied.

Judge CLARK dissents in separate opinion.

CLARK, Circuit Judge (dissenting from the order denying rehearing *in banc*).

On any of the principles governing the selection of cases to be heard *in banc* either suggested intermurally or of which I can conceive, the present case would seem *a fortiori* one for such consideration. There can be no question of the importance of the issue; and the present departure from previous holdings of this court and of the Supreme Court, even if not as clear as I believe it to be, certainly

---

4. In another portion of the case, the Board found that the union had violated § 8(b) (1) (A) of the N. L. R. A., 29 U.S.C. § 158(b) (1) (A), "by the use of threats and physical force against employees of the Carrier Corporation, by obstructing, blocking and preventing the ingress and egress of Carrier employees at entrances to the Carrier plant, by obstructing the ingress and egress of New York Central Railroad Company personnel in the presence of Carrier employees, and by assaulting peace officers in the presence of Carrier employees." The Board issued an appropriate order and an uncontested decree of enforcement had been entered.

Pending the Board's determination, the Regional Director of the N. L. R. B. obtained temporary injunctive relief against picketing of the railroad's premises. Ramsey v. Local 5895, United Steelworkers of America, 40 (CCH) Labor Cases 70, 275 (N.D.N.Y. April 16, 1960). The union was also subject to an injunction issued in state court proceedings which, inter alia, limited the places and extent of picketing and enjoined violent or disorderly conduct. Carrier Corp. v. Brewster, order entered in the Supreme Court of Onondaga County, April 12, 1960.

presents a *prima facie* case of conflicting precedents. Further, the decision, which rejects the expertise of the National Labor Relations Board, is made by only one of the active judges, with the concurrence of a senior judge and against the powerful dissent of the Chief Judge. An additional anomaly is that the vote on the present order, together with this dissent, shows at least four active judges discontented with the decision; since only one active judge is recorded in favor of it, it seems highly probable that it represents the views at most of only a minority of the court. Because our *in banc* proceedings have actually settled so little, have emphasized division rather than allayed it, I could view with equanimity a decision, if legal, to return to our old course of hearing no cases *in banc*; but our present discriminatory approach, with its correlative consequence, as in a case such as this, of misstating the real position of the court and misleading litigants and others properly interested, seems to me wholly undesirable.

Here we are dealing with the sensitive area in labor relations of the secondary boycott, and particularly with the proviso for "primary picketing" expressly permitted by § 8(b) (4) (ii) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (4) (ii) (B). It seems clear and essentially conceded that the union acts in issue would be within the proviso except that they occurred on the railroad right of way, and not on Carrier's premises. But this emphasis on bare legal title has no connection with the purpose or effect of the proviso, and appears to be the statement of a distinction without a difference. Moreover, it is expressly disclaimed in United Steelworkers of America, AFL-CIO v. N.L.R.B., 2 Cir., 289 F.2d 591, 594, and in Local 761, International Union of Electrical, Radio & Machine Workers, AFL-CIO v. N.L.R.B., 366 U.S. 667, 678-681, 81 S.Ct. 1285, 61 L.Ed.2d 592, citing the Steelworkers case with approval. Thus the situation calls strongly for review by the entire court.